[No. S143723. Mar. 19, 2009.]

Guardianship of ANN S., a Minor.
A.B. et al., Petitioners and Respondents, v.
A.C., Objector and Appellant.

**COUNSEL**

Kimball J. P. Sargeant, under appointment by the Supreme Court, for Objector and Appellant.

C. Athena Roussos; Law Office of Karen Ehler, Karen Ehler; Ishikawa Law Office and Brandon Ishikawa for Petitioners and Respondents.

Gradstein & Gorman and Marc Gradstein for Academy of California Adoption Lawyers and Academy of California Family Formation Lawyers as Amici Curiae on behalf of Petitioners and Respondents.

No appearance for Minor.

Donna Wickham Furth for Northern California Association of Counsel for Children and Legal Services for Children as Amici Curiae on behalf of Minor.

## OPINION

**CORRIGAN, J.**—In 2003 the Legislature enacted Probate Code section 1516.5, making it easier for children in probate guardianships to be adopted by their guardians. (Stats. 2003, ch. 251, § 11; hereafter, section 1516.5.)[1] Section 1516.5 authorizes the termination of parental rights when the guardianship has continued for at least two years, and the court finds that adoption by the guardian would be in the child's best interest. In this case, a mother whose rights were terminated under section 1516.5 contends the statute is unconstitutional on its face because it allows the fundamental rights of parenthood to be extinguished without a showing that the parent is currently unfit, or that termination of parental rights is the alternative least detrimental to the child.

We hold that section 1516.5 is facially constitutional. Generally, due process requires some showing of parental unfitness before rights are terminated, to protect the parent's fundamental interest in child custody. However, it is settled that a showing of current unfitness is not *always* necessary when a court terminates parental rights. Section 1516.5 applies to parents whose custody rights have been suspended during a probate guardianship. A termination proceeding under this statute occurs only when the parent has failed to exercise any custodial responsibility for a two-year period, with the possible exception of visitation. In this context, it would make little sense to require a showing that the parent is currently unfit. As guardianship continues for an extended period, the child develops an interest in a stable, continuing placement, and the guardian acquires a recognized interest in the care and custody of the child. Section 1516.5 appropriately requires the court to balance all the familial interests in deciding what is best for the child. The "least detrimental alternative" standard invoked by mother is effectively included in the determination of the child's best interest.

Mother also claims it was improper to apply section 1516.5 retroactively in this case, because she had relied on preexisting law governing the termination of parental rights when she agreed to place her child in guardianship, two years before the statute was enacted. We conclude that in the circumstances of this case, the trial court's application of section 1516.5 was consistent with due process and with the transitional provisions of Probate Code section 3, subdivision (h). As we explain, trial courts have discretion to determine on a

---

[1] The statute does not apply to guardianships established in juvenile dependency proceedings under the Welfare and Institutions Code. (§ 1516.5, subd. (d); see Welf. & Inst. Code, §§ 360, 366.26, 366.3.)

case-by-case basis whether to apply section 1516.5 to a guardianship in existence on its effective date.

# I. BACKGROUND

Ann S. was born in March 2000. Mother was a heroin addict with a lengthy criminal record. Ann's father was also a drug user. The parents' relationship was unstable. In October and December 2000, father's sister and her husband, respondents A.B. and T.B., cared for Ann while mother was in rehabilitation programs. In September 2001, mother threatened suicide and the police found Ann in mother's apartment, with other drug users. Father briefly assumed custody but quickly proved incapable of caring for Ann. The B.'s applied for guardianship.

In October 2001, mother stipulated to a temporary guardianship without visitation, and agreed to enroll in a rehabilitation program. In December, both parents consented to a permanent guardianship, without visitation for mother. Mother continued using drugs. In April 2002, she pleaded guilty to a theft charge and received a 32-month prison sentence.

Before she negotiated the guilty plea, mother considered allowing the B.'s to adopt Ann, motivated by the possibility that she would be charged with a third strike and sentenced to a lengthy term. However, after the charges were resolved, she refused to consent to an adoption. The B.'s filed an adoption petition in May 2002. Mother objected in a letter from prison to the trial court in July. Father filed his consent several months later. In January 2003, the B.'s sought to terminate mother's parental rights on the grounds of abandonment (Fam. Code, § 7822) and conviction of a felony demonstrating parental unfitness (Fam. Code, § 7825).

A probation officer prepared a social report for the court. The officer had interviewed mother, who claimed the B.'s thwarted her attempts to maintain contact with Ann while mother was incarcerated. Mother wanted her family to "remain intact." Ann's half siblings, ages 15 and 5, were in a long-term guardianship with mother's sister. Mother said that child protective services was not pursuing adoption of those children because of her bond with them. She planned to enroll in a drug treatment program upon her release from prison, and said she had completed parenting and anger management programs.

The officer also interviewed T.B., the prospective adoptive mother. She and A.B. had been married for almost 20 years. She owned a hair salon, and he worked as a warehouseman. She reported that her brother (Ann's father)

was currently in custody due to his drug use. T.B. said that while she was "initially very supportive" of mother, she had no choice but to take custody of Ann because of mother's continued drug use, arrests, and failures in rehabilitation programs. T.B. was concerned about Ann's well-being and the stress caused by the uncertainty of the current situation.

The report concluded that while mother's criminal history alone did not necessarily make her a bad parent, her continued substance abuse was a significant issue. Ann appeared to be thriving in the B.'s nurturing environment. The officer recommended termination of mother's parental rights. However, the court rejected that recommendation. Relying on *In re Jacklyn F.* (2003) 114 Cal.App.4th 747 [7 Cal.Rptr.3d 768], it found that mother could not be deemed to have abandoned Ann because she had been deprived of custody by judicial decree. It also concluded that mother's criminal record was insufficient to establish her unfitness to assume custody in the future.

In February 2004, the same month the court issued its decision, mother was released from prison and entered a drug treatment program. Shortly thereafter, the B.'s filed a new petition to terminate her parental rights under section 1516.5, which took effect on January 1, 2004. (Stats. 2003, ch. 251, § 11.) They alleged that they had been Ann's guardians since December 2001, that their adoption petition was pending, and that adoption was in the child's best interest.

In response, mother contended that section 1516.5 unconstitutionally interferes with parents' substantive due process right to the care, custody, and control of their children; that the statute should not be applied to her retroactively; and that removal from her custody and control would not be in Ann's best interest.

The court received two reports on the matter. An adoption study conducted by a social worker in July 2004 concluded it would be "extremely detrimental" to Ann if she were not permanently placed with the B.'s. Ann was a friendly, normal four-year-old child who called the B.'s "Mama" and "Papa." Their home was large and comfortable. Ann had no relationship with her biological parents and little contact with her half siblings. The B.'s were open to visitation with the half siblings once the adoption was finalized.

The same conclusion was reached by a licensed family therapist who submitted a report in March 2005. Ann was fully bonded to the B.'s, after a "painful separation" from mother at the age of 17 months. She was developing appropriately and about to begin kindergarten. A major change in her

primary attachments would be stressful, and adoption by the B.'s would be in her best interest. The therapist recommended no visitation with mother and the half siblings until Ann was at least 12 years old. At that point, if Ann demonstrated a consistent interest or need to meet them, and mother and the half siblings were properly prepared with reunification counseling, visitation might be undertaken. The therapist noted that mother had never completed a full course of residential drug treatment, and was living with her sister. She did "appear to be trying to turn her life around" and claimed to be meeting her parole requirements. She had not seen Ann for over three years.

The court heard testimony from the therapist as well as from T.B., one of the half siblings, and mother. It found that the evidence supported the findings and conclusions of the social worker and the therapist. It noted that mother was "not in a position to take custody of the minor and could not say when she would be in a position to take custody." She sought only visitation, but there was "uncontroverted evidence" that visitation was not in Ann's best interest. Finding by clear and convincing evidence that adoption by the B.'s would be in Ann's best interest, the court terminated mother's parental rights.

The Court of Appeal affirmed, rejecting mother's constitutional claims and her argument that section 1516.5 should not be applied to her retroactively. We granted review.

## II. DISCUSSION

### A. *Probate Guardianship*

A brief review of probate guardianship is in order. This custodial arrangement originated in the law governing the administration of decedents' estates, but it has not been restricted to orphans. Long before the advent of the dependency statutes, probate guardianships were instituted when "conditions [were] shown to be such, by reason of the mental and moral limitations or delinquency of parents, that to allow the child to continue in their custody would be to endanger [the child's] permanent welfare." (*In re Imperatrice* (1920) 182 Cal. 355, 358 [188 P. 48].)[2] In such cases, courts recognized that the "right of the parent [to custody] must give way, its preservation being of

---

[2] See also *In re Lundberg* (1904) 143 Cal. 402, 411 [77 P. 156]; *In re Vance* (1891) 92 Cal. 195, 198 [28 P. 229]; Weisz & McCormick, *Abandon Probate Court for Abandoned Children: Combining Probate Guardianship of the Person and Dependency into One Stronger, Fairer Children's Court* (2003) 12 S. Cal. Rev. L. & Women's Stud. 191, 194–195 (hereafter Weisz & McCormick).

less importance than the health, safety, morals, and general welfare of the child." (*Imperatrice*, at p. 358.)

After the passage of the juvenile dependency statutes, probate guardianships have continued to provide an alternative placement for children who cannot safely remain with their parents. (See Weisz & McCormick, *supra*, 12 S. Cal. Rev. L. & Women's Stud. at pp. 195–196.) The differences between probate guardianships and dependency proceedings are significant. (*Id.* at pp. 195–197.) Probate guardianships are not initiated by the state, but by private parties, typically family members. They do not entail proof of specific statutory grounds demonstrating substantial risk of harm to the child, as is required in dependency proceedings. (See Welf. & Inst. Code, § 300; *Guardianship of Stephen G.* (1995) 40 Cal.App.4th 1418, 1429–1430 [47 Cal.Rptr.2d 409].) Unlike dependency cases, they are not regularly supervised by the court and a social services agency. No governmental entity is a party to the proceedings. It is the family members and the guardians who determine, with court approval, whether a guardianship is established, and thereafter whether parent and child will be reunited, or the guardianship continued, or an adoption sought under section 1516.5.

"A relative or other person on behalf of the minor, or the minor if 12 years of age or older, may file a petition for the appointment of a guardian . . . ." (Prob. Code, § 1510, subd. (a).) The probate court may appoint a guardian "if it appears necessary or convenient." (Prob. Code, § 1514, subd. (a).)[3] An investigation into the circumstances of the proposed guardianship may be conducted, though the court may waive the investigation. (Prob. Code, § 1513, subd. (a).)[4] A probate guardianship is often established with parental consent, as in this case. (See, e.g., *In re Charlotte D.* (2009) 45 Cal.4th 1140; *Guardianship of L.V.* (2006) 136 Cal.App.4th 481, 485 [38 Cal.Rptr.3d 894]; *Guardianship of Kassandra H.* (1998) 64 Cal.App.4th 1228, 1237 [75 Cal.Rptr.2d 668]; *Guardianship of M.S.W.* (1982) 136 Cal.App.3d 708, 710 [186 Cal.Rptr. 430].) A parent who objects to guardianship is entitled to notice and a hearing. (Prob. Code, § 1511.)

Early authorities held that in contested guardianship cases, parents were entitled to retain custody unless affirmatively found unfit. (14 Witkin, Summary of Cal. Law (10th ed. 2005) Wills and Probate, § 928,

---

[3] The Probate Code also includes provisions for temporary guardianship pending the appointment of a permanent guardian, or during a suspension of the guardian's powers. (Prob. Code, § 2250 et seq.)

[4] The statute contemplates a referral to the county social services agency if an investigation uncovers allegations of parental unfitness. (Prob. Code, § 1513, subd. (c).) But the circumstances of this case, and the legislative history of section 1516.5 (see pt. II.B., *post*), suggest that this requirement does not always lead to the involvement of the county. (See Weisz & McCormick, *supra*, 12 S. Cal. Rev. L. & Women's Stud. at pp. 202–203.)

pp. 1031–1032, citing cases.) However, the unfitness standard fell out of favor and the best interest of the child, as determined under the custody statutes, became the controlling consideration. (*In re B. G.* (1974) 11 Cal.3d 679, 694–698 [114 Cal.Rptr. 444, 523 P.2d 244]; *Guardianship of Marino* (1973) 30 Cal.App.3d 952, 957–958 [106 Cal.Rptr. 655].) The Probate Code now specifies that the appointment of a guardian is governed by the Family Code chapters beginning with sections 3020 and 3040. (Prob. Code, § 1514, subd. (b).)

█ Family Code section 3020, subdivision (a) declares that "the health, safety, and welfare of children shall be the court's primary concern in determining the best interest of children when making any orders regarding the physical or legal custody or visitation of children." Under Family Code section 3040, subdivision (a), parents are first in the order of preference for a grant of custody, but "the court and the family" are allowed "the widest discretion to choose a parenting plan that is in the best interest of the child." (Fam. Code, § 3040, subd. (b).) Before granting custody to a nonparent over parental objection, the court must find "clear and convincing evidence" that "granting custody to a parent would be detrimental to the child and that granting custody to the nonparent is required to serve the best interest of the child." (Fam. Code, § 3041, subds. (b), (a).)

In 2002, the Legislature added subdivisions to Family Code section 3041 emphasizing the importance of a stable home environment for the child. (Stats. 2002, ch. 1118, § 3.) It specified that " 'detriment to the child' includes the harm of removal from a stable placement of a child with a person who has assumed, on a day-to-day basis, the role of his or her parent, fulfilling both the child's physical needs and the child's psychological needs for care and affection, and who has assumed that role for a substantial period of time. A finding of detriment does not require any finding of unfitness of the parents." (Fam. Code, § 3041, subd. (c).) And, "if the court finds by a preponderance of the evidence that the person to whom custody may be given is a person described in subdivision (c), this finding shall constitute a finding that the custody is in the best interest of the child and that parental custody would be detrimental to the child absent a showing by a preponderance of the evidence to the contrary." (Fam. Code, § 3041, subd. (d).) Thus, the Legislature has determined that the critical finding of detriment to the child does not necessarily turn on parental unfitness. It may be based on the prospect that a successful, established custodial arrangement would be disrupted. (See *Guardianship of L.V., supra*, 136 Cal.App.4th at p. 491.)

█ When the court appoints a guardian, the authority of the parent "ceases." (Fam. Code, § 7505, subd. (a).) The court has discretion to grant visitation (*Guardianship of Martha M.* (1988) 204 Cal.App.3d 909, 911 [251

Cal.Rptr. 567]), but otherwise parental rights are completely suspended for the duration of a probate guardianship (*Guardianship of Stephen G., supra*, 40 Cal.App.4th at p. 1426). The guardian assumes the care, custody, and control of the child. (Prob. Code, § 2351, subd. (a).) There is no periodic court review of the placement, as there is in dependency proceedings. (*Stephen G.*, at p. 1429.) Nor is the parent given the reunification services that the county provides to parents of dependent children. (*Guardianship of Kaylee J.* (1997) 55 Cal.App.4th 1425, 1430–1432 [64 Cal.Rptr.2d 662].)

Unless ended by court order, the guardianship continues until the child "attains majority or dies." (Prob. Code, § 1600, subd. (a).) The court may terminate the guardianship on a petition by the guardian, a parent, or the child, based on the child's best interest. (Prob. Code, § 1601.) The fitness of the parent to assume custody is not a controlling consideration. (*Guardianship of L.V., supra*, 136 Cal.App.4th at pp. 488–491.)

## B. *Section 1516.5*

Section 1516.5 authorizes the termination of parental rights after two years of probate guardianship, if adoption by the guardian is in the child's best interest.[5] An analysis prepared by Senate Judiciary Committee staff notes that under preexisting law, a guardian seeking to adopt without the consent of the child's parents was required to proceed under the provisions of Family Code

---

[5] Section 1516.5 provides:

"(a) A proceeding to have a child declared free from the custody and control of one or both parents may be brought in the guardianship proceeding pursuant to Part 4 (commencing with Section 7800) of Division 12 of the Family Code, if all of the following requirements are satisfied:

"(1) One or both parents do not have the legal custody of the child.

"(2) The child has been in the physical custody of the guardian for a period of not less than two years.

"(3) The court finds that the child would benefit from being adopted by his or her guardian. In making this determination, the court shall consider all factors relating to the best interest of the child, including, but not limited to, the nature and extent of the relationship between all of the following:

"(A) The child and the birth parent.

"(B) The child and the guardian, including family members of the guardian.

"(C) The child and any siblings or half-siblings.

"(b) The court shall appoint a court investigator or other qualified professional to investigate all factors enumerated in subdivision (a). The findings of the investigator or professional regarding those issues shall be included in the written report required pursuant to Section 7851 of the Family Code.

"(c) The rights of the parent, including the rights to notice and counsel provided in Part 4 (commencing with Section 7800) of Division 12 of the Family Code, shall apply to actions brought pursuant to this section.

"(d) This section does not apply to any child who is a dependent of the juvenile court or to any Indian child."

section 7822 et seq.[6] (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 182 (2003–2004 Reg. Sess.) as amended Mar. 26, 2003, pp. 7–8.) The analysis explains: "This bill would create yet another avenue for a guardian where the child has been in the custody of the guardian for a long time and the parent or parents are not likely to reclaim the child but the parent or parents do not fall under one of the categories covered by existing law.

"The situation that this bill intends to cover, for example, is where one parent cannot be found, and the other voluntarily gave the child to the guardian in a written guardianship agreement that may or may not have been entered in a formal court proceeding.[7] Years later it became apparent that the child has bonded with the guardians as parents, but since the birth parents visited occasionally, abandonment could not be established. Another example given by the sponsor is where a drug addicted mother gives the child in guardianship, hoping to get herself rehabilitated but repeatedly fail[s], creating a situation where the child is in the custody of the guardian for years without being in the foster care system. The sponsor contends that in either case, a guardian should be able to adopt the child without having to obtain consent or prove neglect, abandonment, or the mental disorder or mental illness of the parent who gave them [*sic*] guardianship in the first place.

"Given the other avenues left available, the sponsor believes that creating this new provision applicable only under the limited circumstances would allow a child to remain in and be adopted into a loving home in which he or she has been living. Adoption would take away any fear that someday his or her birth parent or parents would come back to reclaim him or her." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 182, *supra*, at pp. 8–9.)

The committee analysis summarized the intent of the proposed legislation as follows: "to institute a new procedure for the court to terminate parental

---

[6] The Family Code grounds for terminating parental rights may briefly be described as follows: abandonment (Fam. Code, § 7822); neglect or cruel treatment, and a year of removal from parental custody under juvenile court jurisdiction (§ 7823); disability due to substance abuse or moral depravity, and a year of removal from parental custody under juvenile court jurisdiction (§ 7824); conviction of a felony demonstrating parental unfitness (§ 7825); developmental disability, mental illness, or mental disability resulting in parental unfitness (§§ 7826 & 7827); a year of out-of-home placement, failure to attain parental fitness, and likely failure to do so in the future (§ 7828); a juvenile court finding that reunification services shall not be provided to the parents of a dependent child (§ 7829).

[7] The reference in this committee analysis to a guardianship agreement not formalized in a court proceeding does not mean that section 1516.5 applies even if the probate court has not instituted a guardianship. California law does not recognize "informal" guardianship. A petition under section 1516.5 may be brought only in a "guardianship proceeding." (§ 1516.5, subd. (a).)

rights when a child has been in the custody of a guardian for at least two years but there is no basis for the termination of parental rights except that it would be in the best interest of the child to be adopted by the guardian." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 182, *supra*, at p. 4.)[8] The experience of the parties here demonstrates the effect of the new procedure. The B.'s were unable to adopt Ann under former law requiring a showing of parental unfitness. Section 1516.5, however, allowed the court to terminate mother's parental rights based on Ann's best interest.

### C. *Facial Constitutionality*

Mother raises a facial challenge to the constitutionality of section 1516.5. She does not contend the statute is invalid based on any aspect of her particular circumstances, except in her retroactivity argument. (See pt. II.D., *post*.) The standard governing facial challenges has been a matter of some debate, within both this court and the United States Supreme Court. (See, e.g., *Zuckerman v. State Bd. of Chiropractic Examiners* (2002) 29 Cal.4th 32, 39 [124 Cal.Rptr.2d 701, 53 P.3d 119], and cases cited therein; *United States v. Booker* (2005) 543 U.S. 220, 276, fn. 1 [160 L.Ed.2d 621, 125 S.Ct. 738] (dis. opn. of Stevens, J.); *Kolender v. Lawson* (1983) 461 U.S. 352, 358, fn. 8 [75 L.Ed.2d 903, 103 S.Ct. 1855].) Here, mother claims section 1516.5 is unconstitutional in all cases. Thus, she attempts to meet the strictest requirement for establishing facial unconstitutionality, asserting that the statute "inevitably pose[s] a present total and fatal conflict with applicable constitutional prohibitions." (*Pacific Legal Foundation v. Brown* (1981) 29 Cal.3d 168, 181 [172 Cal.Rptr. 487, 624 P.2d 1215].)

■ We hold that the statute passes muster, not only under the strictest test but also under the more lenient standard sometimes applied: mother fails to establish that section 1516.5 conflicts with due process "in the *generality* or *great majority* of cases." (*San Remo Hotel v. City and County of San Francisco* (2002) 27 Cal.4th 643, 673 [117 Cal.Rptr.2d 269, 41 P.3d 87]; see also, e.g., *Zuckerman v. State Bd. of Chiropractic Examiners, supra,* 29

---

[8] Mother notes that a Senate floor analysis includes the observation: "There are some constitutional problems with this procedure that may be curable." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 182 (2003–2004 Reg. Sess.) as amended Apr. 8, 2003, p. 4.) The problems were not those raised by mother in her constitutional challenge, however. The remark to which she refers is also found in the Senate Judiciary Committee analysis quoted above, with a reference to further discussion in a comment. (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 182, *supra*, at p. 4.) That comment expresses concern over legal representation for the parents whose rights are subject to termination, and queries whether they should be given appointed counsel. (*Id.* at p. 8.) As enacted, section 1516.5, subdivision (c) incorporates the provisions for appointment of counsel in Family Code section 7860 et seq.

Cal.4th at p. 46; *Chicago v. Morales* (1999) 527 U.S. 41, 55, fn. 22 [144 L.Ed.2d 67, 119 S.Ct. 1849] (plur. opn. of Stevens, J.).)

■ Mother argues that section 1516.5 is unconstitutional because it permits the termination of parental rights based only on the child's best interest. She contends due process requires a showing by clear and convincing evidence that the parent is presently unfit, or that terminating parental rights is the least detrimental alternative for the child. Her claims are based on a parent's fundamental interest in "the companionship, care, custody, and management of his or her children." (*Stanley v. Illinois* (1972) 405 U.S. 645, 651 [31 L.Ed.2d 551, 92 S.Ct. 1208]; see also *In re B. G., supra*, 11 Cal.3d at p. 688.) It is noteworthy, however, that while mother invokes the due process protections courts have developed to protect this interest, she is not seeking to obtain the interest here. Neither she nor any other parent in a section 1516.5 proceeding has or stands to gain the companionship, care, custody, or management of the child. If mother defeats the effort to terminate her parental rights, the guardianship continues and those rights remain in a state of suspension.

The only aspect of mother's challenge that requires extended discussion is the parental unfitness criterion. Regarding the standard of proof, mother does not dispute that clear and convincing evidence is required by statute for the findings specified in section 1516.5.[9] It is the nature of those findings to which she objects. Similarly, while mother insists that an order terminating parental rights must be based on present circumstances, there is no question that section 1516.5 requires the court to consider the current situation of the child, the guardians, and the parent. Mother's quarrel is with the kind of circumstances the court is directed to examine.

■ The "least detrimental alternative" formulation advocated by mother also collapses upon examination. "[T]he least detrimental alternative standard is but a 'more precise formulation' of the best interest of the child standard." (*In re Rico W.* (1986) 179 Cal.App.3d 1169, 1176 [225 Cal.Rptr. 472]; see also, e.g., *Adoption of Michael D.* (1989) 209 Cal.App.3d 122, 134 [256 Cal.Rptr. 884], superseded by statute on another point, as noted in *In re Mario C.* (1990) 226 Cal.App.3d 599, 606 [276 Cal.Rptr. 548].) Some courts

---

[9] A proceeding to terminate parental rights under section 1516.5 is "brought in the guardianship proceeding pursuant to Part 4 (commencing with Section 7800) of Division 12 of the Family Code." (§ 1516.5, subd. (a).) "The rights of the parent . . . provided in Part 4 (commencing with Section 7800) of Division 12 of the Family Code, shall apply." (§ 1516.5, subd. (c).) Family Code section 7821 requires findings to be supported by clear and convincing evidence, except as otherwise provided. No exception applies to section 1516.5 proceedings. Thus, the clear and convincing evidence standard governs the court's findings, as the trial court in this case recognized.

have favored this alternative as a way to focus attention on current circumstances, and prevent speculation about possible future events that might tend to subordinate the child's interests to those of adult claimants. (*Adoption of Michelle T.* (1975) 44 Cal.App.3d 699, 708 [117 Cal.Rptr. 856]; see *In re Angelia P.* (1981) 28 Cal.3d 908, 917 [171 Cal.Rptr. 637, 623 P.2d 198].) However, the "least detrimental alternative" has never supplanted the best interest of the child standard. In any event, whichever alternative the court deems "least detrimental" for the child at a section 1516.5 hearing will necessarily be the alternative that would serve the child's best interest.[10]

Mother attempts to link the "least detrimental alternative" standard with parental unfitness, relying on *In re Carmaleta B.* (1978) 21 Cal.3d 482 [146 Cal.Rptr. 623, 579 P.2d 514], a case arising under the dependency statutes. But the *Carmaleta B.* court made a point of distinguishing parental unfitness from detriment to the child. (*Id.* at p. 489; see also *In re B. G., supra,* 11 Cal.3d at pp. 698–699.) Moreover, the court discussed *statutory* grounds of parental unfitness, without elevating them to constitutional requirements. (*Carmaleta B.,* at pp. 490–495.)

■ The gravamen of mother's claims is that section 1516.5 violates due process by failing to require a finding of parental unfitness before the court frees a child for adoption. It is settled, however, that such a finding is not an invariable constitutional requirement when parental rights are terminated. *Quilloin v. Walcott* (1978) 434 U.S. 246 [54 L.Ed.2d 511, 98 S.Ct. 549] (*Quilloin*) establishes the principle. There, an unwed father sought to block his son's adoption by the mother's husband. Although the child had frequently visited his father and occasionally received presents from him, the boy had always lived with his mother. The mother married when the child was two years old; the adoption petition was filed when he was 11. The trial court granted the petition, denied the father's requests for legitimation and visitation, and rejected his challenge to the constitutionality of statutes that gave him no right to object to the adoption. It based its decision on the child's best interest, without finding that the father would be an unfit parent. (*Quilloin,* at pp. 247, 251–252.)

The Supreme Court unanimously concluded that the father's constitutional rights were not infringed. "We have little doubt that the Due Process Clause would be offended '[i]f a State were to attempt to force the breakup of a

[10] Although the finding required by section 1516.5, subdivision (a)(3) is simply that "the child would benefit from being adopted by his or her guardian," there is no doubt that this requires a determination of the child's best interest. It would be absurd for the court to conclude that *any* benefit from adoption would be sufficient, regardless of competing considerations. "Benefit" in this context means that adoption would be the best alternative for the child, as is clear from the Legislature's specification that "[i]n making this determination, the court shall consider all factors relating to the best interest of the child . . . ." (§ 1516.5, subd. (a)(3).)

natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest.' *Smith v. Organization of Foster Families*, 431 U.S. 816, 862–863 [53 L.Ed.2d 14, 97 S.Ct. 2094] (1977) (STEWART, J., concurring in judgment). But this is not a case in which the unwed father at any time had, or sought, actual or legal custody of his child. Nor is this a case in which the proposed adoption would place the child with a new set of parents with whom the child had never before lived. Rather, the result of the adoption in this case is to give full recognition to a family unit already in existence, a result desired by all concerned, except appellant. Whatever might be required in other situations, we cannot say that the State was required in this situation to find anything more than that the adoption, and denial of legitimation, were in the 'best interests of the child.' " (*Quilloin, supra*, 434 U.S. at p. 255; accord, e.g., *Lehr v. Robertson* (1983) 463 U.S. 248, 263, fn. 19 [77 L.Ed.2d 614, 103 S.Ct. 2985].)

*Quilloin* demonstrates that the best interest of the child is a constitutionally permissible basis for terminating parental rights in some circumstances. Clearly, the rights of a father like Mr. Quilloin could be terminated under section 1516.5 without violating due process. Because mother fails to show that section 1516.5 conflicts with constitutional requirements in all cases, the statute must be deemed facially constitutional under the strict standard we applied in *Pacific Legal Foundation v. Brown, supra*, 29 Cal.3d at page 181.

■ Nor do mother's arguments persuade us that section 1516.5 is unconstitutional under the alternate standard set out in cases such as *San Remo Hotel v. City and County of San Francisco, supra*, 27 Cal.4th 643. She fails to show that in "the *generality* or *great majority* of cases" (*id.* at p. 673), a parent whose child has remained in a guardianship for two or more years is entitled to insist that his or her unfitness be proven when the guardian seeks to adopt the child. Due process requires a showing of unfitness before termination of parental rights in order to protect the integrity of a natural family, i.e., one in which there is a custodial relationship between parent and child. (*Quilloin, supra*, 434 U.S. at p. 255; see also *Lehr v. Robertson, supra*, 463 U.S. at pp. 259–260; *In re Heather B.* (1992) 9 Cal.App.4th 535, 556, fn. 12 [11 Cal.Rptr.2d 891].) In *Troxel v. Granville* (2000) 530 U.S. 57 [147 L.Ed.2d 49, 120 S.Ct. 2054], the high court reaffirmed that this requirement derives from "a presumption that fit parents act in the best interests of their children." (*Id.* at p. 68 (plur. opn. of O'Connor, J.).) "[S]o long as a parent adequately cares for his or her children (*i.e.*, is fit), there will

normally be no reason for the State to inject itself into the private realm of the family . . . ." (*Id.* at p. 68.)[11]

Thus, " 'some showing of unfitness' " is called for when a custodial parent faces termination of his or her rights. (*Quilloin, supra,* 434 U.S. at p. 255.) In that circumstance, there is no dispute that the best interest of the child would not be a constitutionally sufficient standard for terminating parental rights. "Even if it were shown . . . that a particular couple desirous of adopting a child would *best* provide for the child's welfare, the child would nonetheless not be removed from the custody of its parents so long as they were providing for the child *adequately.*" (*Reno v. Flores* (1993) 507 U.S. 292, 304 [123 L.Ed.2d 1, 113 S.Ct. 1439], citing *Quilloin, supra,* 434 U.S. at p. 255.) However, section 1516.5 has no application to custodial parents. It affects only parents whose rights have been suspended for an extended period of probate guardianship.

In limited circumstances, this court has held that the best interest of the child cannot justify terminating the rights of a parent who has demonstrated a full commitment to parental responsibility, but whose efforts to secure custody have been thwarted. In *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 [4 Cal.Rptr.2d 615, 823 P.2d 1216] (*Kelsey S.*), we reviewed a statutory scheme permitting the termination of an unwed father's parental rights if adoption was in the child's best interest, even though the mother had prevented the father from receiving the child into his home and establishing the status of "presumed father." (*Id.* at pp. 824–825.) We concluded that "[i]f an unwed father promptly comes forward and demonstrates a full commitment to his parental responsibilities—emotional, financial, and otherwise—his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent." (*Id.* at p. 849.) However, we emphasized that the father would be deprived of his constitutional right "if (*but only if*) . . . [he] demonstrated the necessary commitment to his parental responsibilities." (*Id.* at p. 850; see also *Lehr v. Robertson,*

---

[11] The comments on parental fitness in Justice O'Connor's plurality opinion found general agreement in the dissents filed by Justices Stevens and Kennedy. (*Troxel v. Granville, supra,* 530 U.S. at pp. 86 (dis. opn. of Stevens, J.) & 95 (dis. opn. of Kennedy, J.); see also *id.* at p. 77 (conc. opn. of Souter, J.).) As Justice Stevens also observed: "A parent's rights with respect to her child have . . . never been regarded as absolute, but rather are limited by the existence of an actual, developed relationship with a child, and are tied to the presence or absence of some embodiment of family. These limitations have arisen, not simply out of the definition of parenthood itself, but because of this Court's assumption that a parent's interests in a child must be balanced against the State's long-recognized interests as *parens patriae,* [citations], and, critically, the child's own complementary interest in preserving relationships that serve her welfare and protection, [citation]." (*Id.* at p. 88 (dis. opn. of Stevens, J.).)

*supra*, 463 U.S. at p. 262.)[12] Otherwise, the statutory best interest of the child standard would be "constitutionally sufficient." (*Kelsey S.*, at p. 849.)

■ Mother relies on *Kelsey S.*, but falls well short of establishing that "in the *generality* or *great majority* of cases" section 1516.5 violates the due process rights of parents who have demonstrated a full commitment to their responsibilities. (*San Remo Hotel v. City and County of San Francisco, supra*, 27 Cal.4th at p. 673.) Termination of parental rights and adoption by a guardian can occur only when the parent has surrendered custody to the guardian and exercised no parental care or control for at least two years. (§ 1516.5, subd. (a).)[13] A prolonged guardianship, during which all parental

---

[12] *Lehr* did not involve the unfitness standard, but the right of an unwed father who had never lived with or supported the child to receive notice of adoption proceedings. (*Lehr v. Robertson, supra*, 463 U.S. at pp. 264–265.) But the court made the following useful observations about the connection between parental rights and responsibilities. "[T]he rights of the parents are a counterpart of the responsibilities they have assumed. Thus, the 'liberty' of parents to control the education of their children that was vindicated in *Meyer v. Nebraska*, 262 U.S. 390 (1923) [67 L.Ed. 1042, 43 S.Ct. 625], and *Pierce v. Society of Sisters*, 268 U.S. 510 (1925) [69 L.Ed. 1070, 45 S.Ct. 571], was described as a 'right, coupled with the high duty, to recognize and prepare [the child] for additional obligations.' *Id.*, at 535. The linkage between parental duty and parental right was stressed again in *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) [88 L.Ed. 645, 64 S.Ct. 438], when the Court declared it a cardinal principle 'that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.' *Ibid*. In these cases the Court has found that the relationship of love and duty in a recognized family unit is an interest in liberty entitled to constitutional protection." (*Lehr*, at pp. 257–258.)

[13] The parties, and amici curiae Northern California Association of Counsel for Children and Legal Services for Children, assume in their briefing that section 1516.5 applies only after two years of guardianship. We note that the statutory terms are less than precise on this point. A prerequisite for filing a termination proceeding under section 1516.5 is that "[t]he child has been in the physical custody of the guardian for a period of not less than two years." (§ 1516.5, subd. (a)(2).) The reference to "physical custody" is ambiguous; it might include a period before the acquisition of legal custody through the establishment of a guardianship, or it might simply require that the guardian act as physical custodian, in addition to having legal custody. The former construction is constitutionally problematic, because it would imply that the parent's legal and perhaps joint physical custody rights might continue until the time of the termination proceeding. We adopt the construction that avoids casting doubt on the statute's constitutional validity, and hold that physical and legal custody by the guardian for two years is required under section 1516.5, subdivision (a)(2). (*Metromedia, Inc. v. City of San Diego* (1982) 32 Cal.3d 180, 186 [185 Cal.Rptr. 260, 649 P.2d 902]; *In re Edgar M.* (1975) 14 Cal.3d 727, 736 [122 Cal.Rptr. 574, 537 P.2d 406].)

Similarly, section 1516.5, subdivision (a)(1) requires that "[o]ne or both parents do not have the legal custody of the child." To the extent this provision suggests that a parent with legal custody rights might be faced with a termination proceeding under section 1516.5, it would be constitutionally suspect. However, that circumstance will never occur. A section 1516.5 proceeding cannot be filed unless there is a guardianship in place. After the appointment of a guardian, neither parent has legal custody. (Fam. Code, § 7505, subd. (a); *Guardianship of Zachary H.* (1999) 73 Cal.App.4th 51, 61 [86 Cal.Rptr.2d 7].)

rights and custodial responsibilities are suspended, with the possible exception of visitation rights, is generally *inconsistent* with "a full commitment to . . . parental responsibilities—emotional, financial, and otherwise." (*Kelsey S., supra*, 1 Cal.4th at p. 849.)

There are imaginable scenarios in which a fully responsible parent might find it necessary to place a child in guardianship and, despite maintaining a parental commitment as full as the circumstances permit, eventually face a termination proceeding under section 1516.5. Mother posits the plight of a single mother in the National Guard, called to duty overseas, and unable to reclaim custody for two years. However, "we may not invalidate a statute simply because in some future hypothetical situation constitutional problems may arise." (*California Teachers Assn. v. State of California* (1999) 20 Cal.4th 327, 347 [84 Cal.Rptr.2d 425, 975 P.2d 622]; see also *Zuckerman v. State Bd. of Chiropractic Examiners, supra*, 29 Cal.4th at p. 50.) We note that section 1516.5 requires the court to consider "all factors relating to the best interest of the child," which would include the circumstances leading to guardianship, the parent's efforts to maintain contact with the child, any exigencies that might hamper those efforts, and other evidence of commitment to parental responsibilities. (§ 1516.5, subd. (a)(3).) We also note that section 1516.5 is open to constitutional challenge as applied to particular parents. (See *In re Charlotte D., supra*, 45 Cal.4th 1140.)

Mother relies on a number of dependency cases from this court and the United States Supreme Court to support her claim that a finding of parental unfitness is constitutionally required in a section 1516.5 proceeding. Her authorities do not support that conclusion.[14]

■■■ As discussed above, *Quilloin* and *Kelsey S.* establish that in a private adoption proceeding, parental rights may sometimes be terminated without any prior judicial finding of parental unfitness. (*Quilloin, supra*, 434 U.S. at

---

[14] Mother also refers to three out-of-state cases, none of which is on point. In *In re J. P.* (Utah 1982) 648 P.2d 1364, the court struck down a statute authorizing the termination of parental rights based on the child's best interest, after six months of removal from parental custody by temporary order of the juvenile court. (*Id.*, 648 P.2d at pp. 1368, 1375.) In *In re Adoption of Mays* (1986) 30 Ohio App. 3d 195 [507 N.E.2d 453], the court struck down a statute authorizing the probate court to award "permanent custody," which effectively eliminated all parental rights, based solely on the child's best interest. (*Id.*, 507 N.E.2d at pp. 456, 458.) In *Petitions of Department of Social Services to Dispense with Consent to Adoption* (1983) 389 Mass. 793 [452 N.E.2d 497], the court briefly considered the constitutionality of a dependency statute establishing a presumption that if a child has been in the care of the state or a licensed agency for a year, it would be in the child's best interest to be adopted without parental consent. The trial judge had not relied on the presumption, but the court agreed with the parent that it was unconstitutional. (*Id.*, 452 N.E.2d at p. 503.)

Section 1516.5 is unlike any of these statutes. It applies only after at least two years of probate guardianship.

p. 255; *Kelsey S., supra*, 1 Cal.4th at p. 850.) A section 1516.5 proceeding is brought to permit a private adoption by the guardian. Dependency proceedings are fundamentally different. Unlike probate guardianships, they are ongoing court proceedings involving a series of interrelated hearings governed by a comprehensive statutory scheme. (See *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 253 [19 Cal.Rptr.2d 698, 851 P.2d 1307]; *In re Marilyn H.* (1993) 5 Cal.4th 295, 307 [19 Cal.Rptr.2d 544, 851 P.2d 826].) The state is not a party to a probate guardianship, and its resources are not pitted against the parent. (Cf. *Santosky v. Kramer* (1982) 455 U.S. 745, 759 [71 L.Ed.2d 599, 102 S.Ct. 1388].) Nor does the state assume jurisdiction over the child and proceed toward family reunification or an alternative permanent placement, as in dependency cases. Rather, probate guardianship is a private custody arrangement, approved but not supervised by the court. The state initiates no proceedings and carries no burden to prove anything. It performs only a judicial role. (See *Guardianship of Simpson* (1998) 67 Cal.App.4th 914, 931–932 [79 Cal.Rptr.2d 389]; *Guardianship of Kassandra H., supra*, 64 Cal.App.4th at p. 1237.)

Furthermore, the dependency cases cited by mother are consistent with *Quilloin* and *Kelsey S.* in that they employ the parental unfitness standard to protect the parent's custodial rights, rather than to govern decisions made about the child's placement after a period of removal from parental custody. Thus, in *Stanley v. Illinois, supra*, 405 U.S. 645, the high court struck down a statute allowing the state to take custody from an unmarried father after the death of the children's mother, based on a presumption that he was an unfit parent. (*Id.* at pp. 646–647.) The court held that due process guaranteed the father a hearing on his fitness "when the issue at stake is the dismemberment of his family." (*Id.* at p. 658.) Section 1516.5, by contrast, establishes no presumption and does not separate the child from parental custody.[15] The family is dismembered not at the time of a section 1516.5 hearing, but at least two years earlier when the guardianship is established. At the outset of a probate guardianship, the parent's interest in maintaining custody is protected by the parental preference doctrine codified in Family Code section 3041. (Prob. Code, § 1514, subd. (b).)

---

[15] Mother claims section 1516.5 imposes an irrebuttable presumption of unfitness based on the fact that the child has been in guardianship for two years. Not so. The statute simply focuses on the child's best interest, in light of all relevant circumstances.

The Court of Appeal below distinguished *Stanley* on the basis that section 1516.5 effectively incorporates a rebuttable presumption of unfitness. However, nothing in the statute suggests that a showing of current parental fitness would necessarily bar a finding that adoption by the guardian would be in the child's best interest. The statute establishes no presumption, rebuttable or otherwise, with regard to parental fitness.

The constitutional sufficiency of the protections provided to parents by Family Code section 3041 is not before us in this case. That statute was not applied by the trial court, because mother consented to the establishment of the guardianship. She restricts her challenge to Probate Code section 1516.5, and the parties have briefed no constitutional issues surrounding the parental preference doctrine as it now stands under California law.[16] Similarly, though a parent's ability to recover custody from the guardian is a critical factor in the running of the two-year period prescribed by section 1516.5, we have no occasion to consider the constitutionality of Probate Code section 1601, which makes the best interest of the child the sole criterion for terminating a guardianship. Mother never sought to terminate the guardianship in this case, and no due process issues arising under Probate Code section 1601 have been addressed by the parties.[17] We leave the constitutional questions involved in these contexts for cases where they are squarely presented.

For our purposes here, the relevant teaching of the dependency cases is that a finding of parental unfitness is not necessarily required at the point when parental rights are terminated. In a dependency proceeding, due process is satisfied if unfitness is established at an earlier stage, and parental rights terminated later based on the child's best interest. (*Cynthia D. v. Superior Court, supra*, 5 Cal.4th at p. 256; *Santosky v. Kramer, supra*, 455 U.S. at p. 760.)[18] Mother places great reliance on a footnote in *Cynthia D.* discussing an earlier California statutory scheme that required clear and convincing

---

[16] In contested guardianship cases involving the rights of *Kelsey S.* fathers, Courts of Appeal have reasoned that because the proceedings did not involve the termination of parental rights, due process considerations of parental fitness did not apply. (*Guardianship of Zachary H., supra*, 73 Cal.App.4th at pp. 61–62; *Adoption of Daniele G.* (2001) 87 Cal.App.4th 1392, 1408 [105 Cal.Rptr.2d 341].) Section 1516.5 has made the eventual termination of parental rights a potential consequence of establishing a probate guardianship, however.

[17] Again, the constitutional ramifications of the existing statute have been altered by the passage of section 1516.5. In guardianship termination cases, Courts of Appeal have rejected arguments for an elevated standard of proof (*Guardianship of Simpson, supra*, 67 Cal.App.4th at p. 933), and a parental unfitness standard (*Guardianship of L.V., supra*, 136 Cal.App.4th 481, 494–496). These courts reasoned that the due process considerations applicable to the termination of parental rights were not pertinent, because there was no prospect that the parents would face any final termination of their rights. (*Simpson*, at pp. 931–932; *L.V.*, at pp. 493–494.) Section 1516.5 has introduced that prospect.

[18] The New York dependency statutes reviewed in *Santosky* were quite different from our California scheme, and the *Cynthia D.* court went to some length to distinguish *Santosky*. (*Cynthia D. v. Superior Court, supra*, 5 Cal.4th at pp. 250–256.) Nevertheless, while the factfinding and dispositional hearings at issue in *Santosky* were closer together in time than the hearings analyzed in *Cynthia D.*, the *Santosky* court clearly distinguished between them. At the factfinding stage, the New York statute required the state to prove "permanent neglect" by the parents. The court equated this standard with the showing of parental unfitness required by due process. (*Santosky v. Kramer, supra*, 455 U.S. at pp. 748, 759–760 & fn. 10.) At the subsequent dispositional hearing, when parental rights were terminated, the court approved the application of the best interest of the child standard. (*Id.* at pp. 748–749, 752, 760.)

evidence of parental fault in termination proceedings. The *Cynthia D.* court noted that under the former statutes, the clear and convincing evidence standard was "appropriate in light of the fact that this is a separate proceeding in which specific findings of fault or detriment are required." (*Cynthia D.*, at p. 253, fn. 8; see *In re Angelia P., supra*, 28 Cal.3d at p. 919; *In re Carmaleta B., supra*, 21 Cal.3d at pp. 490–495.) Mother argues that a section 1516.5 proceeding is likewise a "separate proceeding" in which a finding of parental fault is required.

The analogy does not hold. The findings of fault discussed in the *Cynthia D.* footnote were prescribed by statute. Due process does not require such findings to be simultaneous with the termination of parental rights. In another case involving the former statutory scheme, we recognized that "the equivalent of a finding of unfitness . . . is necessary *at some point in the proceedings* as a matter of due process before parental rights may be terminated." (*In re Jasmon O.* (1994) 8 Cal.4th 398, 423 [33 Cal.Rptr.2d 85, 878 P.2d 1297], italics added.) Whether the guardianship statutes afford sufficient protection to parental rights in advance of a section 1516.5 hearing is a question beyond the scope of this case. But it is clear that the parental fitness standard, which protects parents' interests in child custody, is not necessarily required at a section 1516.5 hearing. By that stage, the parent-child family unit has ceased to exist and the parent's entitlement to custody is not at issue. It would be anomalous to require proof in every case, by clear and convincing evidence, that a mother or father who has had no custodial responsibilities for two or more years is currently an unfit parent.

 We emphasize that our holding is a narrow one, limited to mother's contention that due process demands a finding of parental unfitness at a section 1516.5 hearing. Parents are entitled to fundamentally fair procedures in proceedings to terminate their rights, whether or not they have custody of their children and whether it is the state or a private party that moves to sever the parental bond. "The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child . . . . Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs." (*Santosky v. Kramer, supra*, 455 U.S. at p. 753; see *In re Sade C.* (1996) 13 Cal.4th 952, 987–988 [55 Cal.Rptr.2d 771, 920 P.2d 716].) However, the procedural standards governing proceedings to terminate parental rights are not invariable. The nature and stage of the proceeding, and the passage of time without parental custody, may make a difference.

After years of guardianship, the child has a fully developed interest in a stable, continuing, and permanent placement with a fully committed caregiver. (Cf. *Guardianship of Kassandra H., supra,* 64 Cal.App.4th at pp. 1238–1239; see also, e.g., *In re Sade C., supra,* 13 Cal.4th at p. 988; *In re Marilyn H., supra,* 5 Cal.4th at p. 306; *In re Daniel M.* (1993) 16 Cal.App.4th 878, 884–885 [20 Cal.Rptr.2d 291].)[19] The guardian, after fulfilling a parental role for an extended period, has also developed substantial interests that the law recognizes. (*In re Kieshia E.* (1993) 6 Cal.4th 68, 75–76 [23 Cal.Rptr.2d 775, 859 P.2d 1290]; *In re B. G., supra,* 11 Cal.3d at pp. 692–693; Fam. Code, § 3041, subds. (c), (d); *Smith v. Organization of Foster Families, supra,* 431 U.S. at pp. 843–844 & fn. 49.) The parental unfitness criterion urged by mother fails to account for these competing interests, whereas the best interest of the child standard allows the court to appropriately balance all the relevant factors arising from the child's family relationships. (§ 1516.5, subd. (a)(3); see *Marilyn H.,* at p. 306; *In re Angelia P., supra,* 28 Cal.3d at pp. 916, 919.)

Accordingly, we hold that section 1516.5 is not unconstitutional on its face for failing to require a finding of present parental unfitness.

## D. *Retroactivity*

Mother contends the trial court erred by applying section 1516.5 retroactively. Respondents, the B.'s, note that a statute does not operate retroactively merely because its application depends on preexisting facts or conditions. (*Western Security Bank v. Superior Court* (1997) 15 Cal.4th 232, 243 [62 Cal.Rptr.2d 243, 933 P.2d 507].) They argue that the trial court simply applied the statute to the existing circumstances. However, "[a] statute is retroactive if it substantially changes the legal effect of past events." (*Kizer v. Hanna* (1989) 48 Cal.3d 1, 7 [255 Cal.Rptr. 412, 767 P.2d 679]; see *Western Security Bank,* at p. 243.) That is plainly the case here.

Mother agreed to temporary guardianship in October 2001 and permanent guardianship in December 2001. In 2003, the B.'s sought to terminate mother's parental rights on grounds provided in the Family Code. They were unsuccessful. After section 1516.5 took effect on January 1, 2004, the B.'s promptly filed a petition under the new statute. The court terminated mother's parental rights in June 2005. Thus, section 1516.5 substantially changed the legal effect of the guardianship that was established two years before the statute's operative date.

---

[19] In the dependency context, we have held that the child's best interest becomes the paramount consideration after an extended period of foster care. (*In re Jasmon O., supra,* 8 Cal.4th at pp. 418–419; *Cynthia D. v. Superior Court, supra,* 5 Cal.4th at p. 256.)

■ In the trial court, mother relied on the general rule that a statute does not operate retroactively unless the Legislature plainly intended it to do so. (*Western Security Bank v. Superior Court, supra*, 15 Cal.4th at p. 243; see also *In re Marriage of Fellows* (2006) 39 Cal.4th 179, 189 [46 Cal.Rptr.3d 49, 138 P.3d 200].) However, as noted by the Court of Appeal, the Legislature has clearly expressed its intention that amendments to the Probate Code apply on their effective date regardless of prior events, with limited exceptions. Probate Code section 3, subdivision (c) provides: "Subject to the limitations provided in this section, a new law applies on the operative date to all matters governed by the new law, regardless of whether an event occurred or circumstance existed before, on, or after the operative date, including, but not limited to, creation of a fiduciary relationship, death of a person, commencement of a proceeding, making of an order, or taking of an action." The "manifest purpose" of this provision is "to make legislative improvements in probate law applicable on their operative date whenever possible." (*Rice v. Clark* (2002) 28 Cal.4th 89, 99 [120 Cal.Rptr.2d 522, 47 P.3d 300].)

Mother now claims she is protected by the limitation provided in subdivision (h) of Probate Code section 3: "If a party shows, and the court determines, that application of a particular provision of the new law . . . would substantially interfere with . . . the rights of the parties or other interested persons in connection with an event that occurred or circumstance that existed before the operative date, the court may, notwithstanding this section or the new law, apply either the new law or the old law to the extent reasonably necessary to mitigate the substantial interference." Although mother failed to invoke this exception below, her arguments are essentially the same as the due process claims she raised in the trial court, and which she renews in this court. Mother contends she was entitled to rely on the state of the law governing termination of parental rights at the time she consented to the guardianship. (For the preexisting statutory grounds, see fn. 6, *ante*.) She notes that she filed a declaration in the trial court stating: "Had Probate Code section 1516.5 existed at the time I was contemplating a guardianship, I probably would not have entered into one."

The provisions of Probate Code section 3, subdivision (h) comport with due process by allowing a party affected by a new statute to show why, under the circumstances presented, justice requires the application of former law.[20] (See *In re Marriage of Fellows, supra*, 39 Cal.4th at pp. 189–190 [applying

---

[20] The comments of the Law Revision Commission make it clear that this exception was meant to operate on a case-by-case basis. "Because it is impractical to attempt to deal with all the possible transitional problems that may arise in the application of the new law to various circumstances, subdivision (h) provides a safety-valve that permits the court to vary the application of the new law where there would otherwise be a substantial impairment of procedure or justice. This provision is intended to apply only in the extreme and unusual case, and is not intended to excuse compliance with the basic transitional provisions simply because

parallel terms of Fam. Code, § 4, subd. (h)].) In weighing such a claim, we consider "the significance of the state interest served by the law, the importance of the retroactive application of the law to the effectuation of that interest, the extent of reliance upon the former law, the legitimacy of that reliance, the extent of actions taken on the basis of that reliance, and the extent to which the retroactive application of the new law would disrupt those actions." (*In re Marriage of Bouquet* (1976) 16 Cal.3d 583, 592 [128 Cal.Rptr. 427, 546 P.2d 1371]; see *Fellows*, at p. 189.)

██ The interests served by section 1516.5 are substantial: affording children in probate guardianships the opportunity to enjoy permanent adoptive homes with familiar caretakers, and giving willing guardians the chance to become adoptive parents. Here, retroactive application is important to provide Ann and the B.'s with the benefits of adoption. On the other hand, little weight attaches to mother's claim that she "probably" would not have consented to the guardianship had she known it might lead to the termination of her parental rights. As the Court of Appeal observed, mother's heroin addiction prevented her from caring for Ann, and she had virtually abandoned the child to the B.'s. Mother's drug use continued after the guardianship was established, and she soon found herself in prison. Thus, whether or not she consented, a guardianship was likely to have been instituted. If a probate guardianship had not been established, a dependency proceeding would have been unavoidable, and mother would then have faced termination of her parental rights on a much shorter timetable. (See Welf. & Inst. Code, § 361.5, subd. (a).) Indeed, the B.'s themselves could have asked the juvenile court to initiate a dependency proceeding, where adoption would be the favored permanent plan if mother were unable to reunify with Ann. (See *In re Jacklyn F., supra*, 114 Cal.App.4th at p. 756.)

██ Given that mother never sought visitation during more than three and a half years of probate guardianship, and had not seen Ann for an even longer period, reunification was at best a remote possibility. Mother does not dispute the trial court's finding that she was in no position to take custody of Ann, and could not say when she would be able to do so. In these circumstances, retroactive application of section 1516.5 was consistent with due process. We note, however, that trial courts have broad discretion to consider all the relevant facts in each case to determine whether to make an exception under Probate Code, section 3, subdivision (h) and the associated due process principles. Our holding on mother's retroactivity claim is limited to the facts of this case.

---

of minor inconveniences or minor impacts on expectations or other interests." (Cal. Law Revision Com. com., reprinted at 52 West's Ann. Prob. Code (2002 ed.) foll. § 3, p. 11.) "The Commission's official comments are deemed to express the Legislature's intent." (*Fair v. Bakhtiari* (2006) 40 Cal.4th 189, 195 [51 Cal.Rptr.3d 871, 147 P.3d 653].)

## III. DISPOSITION

We affirm the judgment of the Court of Appeal.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Moreno, J., concurred.