Filed 3/10/15  Adoption of E.A. CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| Adoption of E.A., a Minor. | 2d Juv. No. B256017<br>(Super. Ct. No. A017024)<br>(Ventura County) |
| M.G.,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>G.C.,<br><br>    Defendant and Appellant. | |

G.C. (mother) appeals the juvenile court's order terminating her parental rights and freeing her minor child E.A. for adoption by her guardian M.G. pursuant to Probate Code[1] section 1516.5.  G.C. contends the court erred in finding that adoption would be in E.A.'s best interests as contemplated in section 1516.5.  We affirm.

FACTS AND PROCEDURAL HISTORY

G.C. and F.A. are the unmarried biological parents of E.A. who was born in Santa Barbara in January 2007.  M.G. is E.A.'s godmother and was mother's close friend.

_____

[1] All further unspecified statutory references are to the Probate Code.

M.G. was present for E.A.'s birth and stayed at the hospital with mother and child until they were discharged.

M.G. moved to Oxnard in October 2007, but continued to visit E.A. in Santa Barbara almost every day. In February 2008, E.A. began spending weekends with M.G. By June 2009, the child was spending only one weekend a month with her parents; by the following August, she was living with M.G. full-time. Father visited every two weeks and occasionally took E.A. to spend the weekend with him and mother.

E.A. lived with M.G. until August 2010, when M.G. was seriously injured in a car accident. E.A. resumed living with mother and father and their second child F.A., Jr., who was born in August 2008. Only two months later, E.A. witnessed an incident of domestic violence in which father knocked mother unconscious. M.G. drove to Santa Barbara and picked up mother and both children. Mother and F.A., Jr., stayed with M.G. for a couple of weeks, then returned to Santa Barbara. E.A. remained with M.G. and has been with her ever since.

On December 1, 2010, M.G. filed a petition for legal guardianship as to E.A. In support of the petition, M.G. stated: "[E.A.] has been living with me since August 27, 2009. When she was living with her parents she experienced seeing domestic violence. She wasn't treated correctly. She constantly saw violence and heard a lot of arguments. Her parents always favored their son instead of her. I have always been there to give [E.A.] the love she needs. When she's with me, she's a happy child." Mother and father consented to M.G.'s appointment as E.A.'s guardian, and letters of guardianship were issued in January 2011. Although no orders were issued regarding visitation, the parents continued to visit with E.A. on a fairly regular basis.

In August 2011, mother and father each petitioned for termination of the guardianship. M.G. opposed the petitions. The court referred the matter to County of Ventura Human Services Agency (HSA) for a report and to mediation on the issue of visitation. Following mediation, the court approved the parties' agreement that father would visit E.A. on alternate Saturdays for a minimum of two hours, while mother would visit the child on alternate Mondays for at least two hours. All visits were to be

2

supervised by M.G. until the parties mutually agreed otherwise.  It was further provided that M.G. and each parent "shall mutually agree when [mother or father's] parenting time increases[.]"

An investigator and social worker appointed by the court both recommended that the petitions to terminate M.G.'s guardianship be denied.  The court denied the petitions after an evidentiary hearing.  The court ruled that M.G. was not to supervise visitation and that E.A.'s sibling F.A., Jr., was to be incorporated into the visits at some point.  The court also ordered that mother and father "are to be brought into the child's therapy at the discretion of" E.A.'s therapist Nadine Lujan, who had been seeing E.A. on a weekly basis since October 2011.

Following further mediation, the parties stipulated that (1) both parents had the right to communicate with Lujan; (2) they would mutually agree upon someone other than Lujan to act as conjoint/reunification therapist for E.A. and her parents; and (3) the parents' visits with E.A. would be supervised by someone the parties mutually agreed upon or a professional monitor assigned by the court.

When the parties could not agree to a parenting plan, the court established a biweekly supervised visitation plan for both parents.  The court also ordered that the pertinent issues be addressed in E.A.'s individual counseling, that the child participate in reunification therapy with both parents, and that the parents and M.G. separately participate in a co-custody parenting program.  Nancy Lopez, a licensed clinical social worker, was later appointed as reunification therapist for E.A. and her parents.

Marie Fisher was assigned to monitor E.A.'s visits with her parents.  In November 2012, Fisher reported that she had terminated the visits because they were detrimental to E.A.'s well-being.  In summarizing E.A.'s visits with father, Fisher reported:  "During all three visits [E.A.] would cry and carry on that she wanted to go home.  She would also begin to act like a baby by sitting on [M.G.'s] lap, curled up, and burying her head into [M.G.'s] chest.  The first two visits took place at a park and . . . only lasted for 1 hour.  On the first visit [M.G.] stayed the entire visit.  On the second visit [M.G.] was able to slowly walk away, further and further a little bit at a time.  While

3

this was happening [E.A.] was crying and calling, 'mother I want to go home.' When [father] would try to walk closer to [E.A.] she would cry louder." During the third visit at a restaurant, E.A. did not want to eat and refused to look at or speak to father. She continually tugged at M.G. because she wanted to leave and ignored father when he said goodbye to her. Fisher "decided to end all three visits after an hour due to [E.A.] crying and carrying on for an hour straight."

E.A.'s visits with mother went no better. Fisher "tried her best during the three scheduled visits to talk to the child before her parent arrived to explain that [she] was not going to leave the child at any time, but as soon as the child noticed her mother approaching she began crying and hiding behind [M.G.]" Fisher also "tried her best to discuss with the child during the second visit why the child was so scared and upset, [and] the child finally spoke to [her] alone and stated I am afraid she is going to take me away. I don't want to see her." During the third visit, E.A. "was so distraught at the restaurant that [Fisher] finally stated to [mother and M.G.] that she . . . would not be able to continue to monitor the visits in the future. [Fisher] explained that emotionally she was not willing to put the child through this procedure every other week. At that point [mother] stated that she was going to tell [Fisher] also on this visit that she could no longer bring herself to put the child and herself through this emotional turmoil and would not be doing visits anymore." At the end of the visit, E.A. "looked at [Fisher] and whispered I don't want to visit with her anymore please."

On December 5, 2012, M.G. initiated adoption proceedings and filed a petition in that action to free E.A. from parental custody and control. (§ 1516.5; Fam. Code, § 7820 et seq.) On July 19, 2013, M.G. filed an adoption request. A substantially identical petition for freedom from parental custody and control was filed in a guardianship action in September 2013. Both parents opposed the petition and the matter was referred to HSA for a report.

In January 2014, HSA filed a report recommending that M.G.'s petition be granted on the ground that freeing E.A. for adoption would be in the child's best interest. The social worker who prepared the report interviewed E.A. and the parents, and also

4

interviewed Lujan and Lopez. Lujan stated that she had recommended M.G. not allow father to have liberal visitation because E.A. was so traumatized by the domestic violence she witnessed. E.A. "was initially more open with" Lujan, but began to "shut down" after several visits with mother and father. This led Lujan to believe it was "more detrimental to continue the visits with her parents" and that the child's interactions with her parents were "not beneficial" to her. Lujan was also aware of an unsubstantiated anonymous referral alleging that M.G. was attempting to alienate E.A. from her parents. Lujan, however, saw no evidence that M.G. had "coached" E.A. or otherwise emotionally abused the child. Lujan stated, "This is a normal, happy child. I just see her loving the guardian and I've seen [E.A.] feeling safe with [M.G.]."

Ms. Lopez opined that E.A. "does not have a significant relationship with either of [her] parents that benefits the minor and that would be detrimental to sever." Lopez terminated her sessions with E.A. after "decid[ing] she could not further traumatize the minor by forcing [E.A.] to talk about the natural parents." Lopez noted, "this little girl, for whatever reason, is so traumatized by the thought of her parents re-entering her life that it was just like a posttraumatic stress situation every time she came into my office. Lots of crying, clinging like a little monkey onto [M.G.] It was very, very, very sad. She's very definitely attached to this woman, who has certainly been a surrogate mother figure to her." According to Lopez, "the reunification effort simply ended" because "the parents essentially could not afford to continue with therapy with no guarantee that [E.A.] would ever return to them[.]"

When the matter was called for trial on March 14, 2014, father announced he was withdrawing his objections to the petition and would allow the adoption to proceed. After hearing testimony from M.G. and mother, the court found by clear and convincing evidence that the elements of section 1516.5 had been met. The court further found that both parents had abandoned E.A. as contemplated in Family Code section 7822. M.G.'s petition was accordingly granted. In issuing its ruling, the court added,

5

"the record should clearly reflect the heartfelt comments of [mother] in that she does not want to give up her child even acknowledging that based on the facts and circumstances that it is more than likely, in her own words, best for [E.A.] to remain where she has been for approaching five years of her seven-year life."

## DISCUSSION

Mother contends the court erred in terminating her parental rights under section 1516.5. She claims the evidence fails to support the court's finding that E.A. would benefit from being adopted by M.G. We disagree.

A child under a guardianship may be declared free from parental custody and control if (1) the parents do not have legal custody of the child; (2) the child has been in the guardian's physical custody for at least two years; and (3) the court finds that the child would benefit from being adopted by the guardian. (§ 1516.5, subd. (a).) "'Benefit' in this context means that adoption would be the best alternative for the child . . . ." (*In re Guardianship of Ann S.* (2009) 45 Cal.4th 1110, 1128, fn. 10 (*Ann S.*).) In making this determination, the court considers all factors relating to the child's best interest, including but not limited to the nature and extent of the child's relationship with her birth parents, her guardian and the guardian's family, and any siblings or half-siblings. (§ 1516.5, subd. (a).) Other relevant factors "include the circumstances leading to guardianship, the parent's efforts to maintain contact with the child, any exigencies that might hamper those efforts, and other evidence of commitment to parental responsibilities. [Citation.]" (*Ann S., supra*, at p. 1132.)

The guardian bears the burden of making the requisite showings under section 1516.5 by clear and convincing evidence. (See *Ann S., supra*, 45 Cal.4th at p. 1127.) Mother only challenges the court's finding on the third prong, i.e., that E.A. would benefit from being adopted by M.G. In reviewing mother's claim, "we look to see whether the court abused its discretion in applying the law and whether substantial

6

evidence in the record supported its finding that adoption is in the child's best interests." (*In re Adoption of Myah M.* (2011) 201 Cal.App.4th 1518, 1542.)

Substantial evidence in the record supports the court's finding that E.A. would benefit from being adopted by her guardian M.G. In arguing otherwise, mother focuses exclusively on the circumstances that led to the guardianship and evidence of her purported commitment to maintaining a parental relationship with E.A. She also improperly casts that evidence in the light most favorable to her position. As we have explained, the parents' conduct is but one of many factors to be considered here. (*Ann S.*, *supra*, 45 Cal.4th at p. 1132.) Moreover, mother's good intentions in agreeing to the guardianship and her commitment to continue parenting E.A. are only relevant to the extent they inform the determination whether adoption by M.G. would be in the child's best interest. M.G. did not have to prove mother was unfit to parent E.A. in order to make this showing. (*Id.* at pp. 1128-1130.)

The record also belies mother's claim that the court failed to consider evidence of her commitment to parenting E.A. in ruling on M.G.'s section 1516.5 petition. The court said that although it had "no doubt" that mother and father were both "caring parents," the parents admittedly "recognize[d] the realities of the relationship and the situation." Mother makes no mention of E.A.'s strong bond with M.G. and M.G.'s family, or of the child's emotional reaction to any contact with either biological parent. Although that reaction is undoubtedly sad and unfortunate, it appears to be the result of trauma she suffered in seeing domestic violence in her parents' home rather than any "coaching" by M.G. E.A.'s therapists and evaluators were unanimous in their belief that adoption by M.G. would not only be in her best interest, but that a continued relationship with her biological parents would be to her detriment. Under the circumstances, the court

7

did abuse its discretion in finding that M.G. had met her burden of proof under section 1516.5 such that E.A. should be freed for adoption.[2]

The order terminating parental rights is affirmed.

NOT TO BE PUBLISHED.

PERREN, J.

We concur:

GILBERT, P. J.

YEGAN, J.

---

[2] In light of our ruling, we need not address mother's claim that the court erred in finding she and father abandoned E.A. as provided in Family Code section 7822.

8

Bruce A. Young, Judge

Superior Court County of Ventura

_____


Janette Freeman Cochran, under appointment by the Court of Appeal, for Defendant and Appellant.

Christopher Blake, under appointment by the Court of Appeal, for Plaintiff and Respondent.