Filed 10/23/20  Adoption of A.K. CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| Adoption of A. K., a Minor. | C091564 |
| W. K. et al., | (Super. Ct. No. CVSA19010) |
| Plaintiffs and Respondents, | |
| v. | |
| E. K. et al., | |
| Defendants and Appellants. | |

Over two years after mother E. K. requested her parents, grandfather W. K. and grandmother R. K. (collectively grandparents), take care of minor A. K., grandparents petitioned to declare minor free from parental custody and control so that grandparents could adopt minor.  Mother and father D. H. (collectively parents) opposed the petition. The trial court granted grandparents' petition despite the fact the probation investigator testified her recommendation that minor be freed from parental custody and control did not include consideration of the relationship between mother and minor.

1

On appeal, parents argue the probation officer's report did not meet statutory requirements, and thus parents are entitled to reversal. Parents also argue there was insufficient evidence to demonstrate by clear and convincing evidence that freeing minor from parental custody and control under Probate Code[1] section 1516.5 was in minor's best interest.[2] We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A

*Underlying Facts*

Mother grew up in a loving family.[3/4] When mother was 16 years old, grandfather lost his job and it was discovered he had had an extramarital affair. The household became tense. Grandmother started drinking alcohol more regularly because of the stress. She noticed it became a crutch and soon curbed the habit. With time, grandparents reconciled, and the relationship became happy again.

---

[1] Section references are to the Probate Code unless otherwise indicated.

[2] Mother brings these arguments in her briefing. Father joins.

[3] Mother claimed grandfather was physically abusive toward grandmother throughout her childhood and injured grandmother on multiple occasions. Mother claimed grandmother would often provoke fights with grandfather, causing grandfather to scream, throw things, and physically assault grandmother. Grandparents denied this occurred. The court rejected mother's testimony as exaggerated and found, to the extent the testimony was true, the conduct described occurred over a decade prior and no evidence established the conduct was ongoing.

[4] In 1991, when grandfather was 19 or 20 years old and before his marriage, he was convicted of misdemeanor battery. Grandfather testified he was on a date with a woman and she became drunk and ill. The next day, she claimed he raped her. A jury found him guilty of misdemeanor battery, and he was sentenced to probation. Because he could not drive to the required community service, he served 30 or 40 days in jail and his probation was terminated as unsuccessful.

Before that could happen, however, mother rebelled. Between the ages of 16 and 22, mother lived with grandparents for days or weeks at a time and then left for extended periods to stay with friends or men she was seeing. During that time, mother never had a consistent paycheck and did not attend school, except to become an esthetician. Also during this time, the relationship between mother and grandparents deteriorated. Once, when grandfather was angry with mother, he threw a book at her head.[5] Grandfather also once spit on mother and once hit her on the back of the head in anger. When mother was 18 years old, she was raped. She lived with grandparents afterward, but could not stay because she felt they blamed her for the assault and treated her differently.

In 2014, mother was arrested in Los Angeles for solicitation. Mother met father in 2015, when she was 23 years old and father was 26 years old. The two became romantically involved and had an open relationship. Mother continued working in the sex trade. Grandmother found numerous online advertisements indicating mother engaged in prostitution. Mother continued to live with grandparents in her usual off-and-on fashion, predominantly when she and father had broken up. While living with grandparents, mother sought services through organizations designed to help women get out of the sex trade. Mother never followed through with counseling or leaving the sex trade, despite grandparents' offer of financial support.

In early 2016, mother became pregnant. On grandfather's birthday, she reached out to mend their relationship and texted him. He responded with a long angry text that included the statement he hoped mother died and that he would bury her in pig manure. In March 2016, mother was arrested in Pennsylvania for prostitution.

---

[5] Mother claimed grandfather also hit and kicked her during this incident and that grandmother watched without intervening. A report was filed with Child Protective Services about the incident but it was dismissed as unfounded, meaning there was not enough information to substantiate the allegation.

When mother was seven or eight months pregnant, father physically assaulted her. Mother called grandparents to get her. When they arrived, mother was visibly injured and accompanied by father's sisters.[6] Mother continued to live with grandparents at father's request. Father believed it best for mother to live with grandparents at the time minor was born because parents did not have a stable apartment. Further, father's experience with the mothers of his two other children led him to believe mother would benefit from having grandmother around for support and guidance. Father was present for minor's birth in October 2016.

Following minor's birth, mother lived with grandparents for two weeks before taking minor to visit father's family in San Jose. Three to four days after taking minor to San Jose, mother gave minor to grandmother and asked grandmother to take care of minor. Five days later, mother returned to grandparents' house and spent the night. The next day was Thanksgiving, and mother took minor to father's family's house for the holiday. The day after Thanksgiving, parents told grandmother she could take minor. Grandmother drove to father's family's house to get minor. When she arrived, parents were not there, but father's family gave her minor.

Mother and grandmother sporadically communicated until December 6, 2016, when mother went to grandmother's house to take minor. Mother loaded the car with minor's clothes and belongings. Mother looked "disheveled," was not in a good frame of mind, and did not have a car seat. Grandmother refused to let mother take minor. When mother insisted on taking minor, grandmother called the police. Mother threw all of minor's belongings in the front yard and left. Grandmother subsequently filed for guardianship. Mother consented to guardianship and told grandmother she wanted to find an apartment before taking responsibility for minor. Mother relied on father's family

---

**6** Mother testified that while she told grandparents it was father who assaulted her, it was actually another man she had been seeing.

for support.  Father told grandmother he wanted grandmother to be minor's guardian because he did not want minor living in hotel rooms.  Grandmother was awarded guardianship of minor on February 27, 2017.

Around that same time, father was charged with evading police.  The charge resulted from father failing to pull over when signaled to do so and leading police on a chase.  Father disposed of items during the chase, including a loaded firearm.  Mother was in the passenger seat of the car at the time of the offense.  Father was convicted and incarcerated.  At that time, grandparents saw an opportunity to help mother.  Mother, however, did not see minor often until June 2017 when she moved into grandparents' house for a month.

While living with grandparents, mother bonded with minor.  The two played and mother helped with minor's basic care.  Grandmother, however, provided the majority of minor's care, and mother was never permitted to be alone with minor.  Grandmother looked into services to help mother, but mother refused help.  Mother told grandmother she wanted to get out of the lifestyle she was living.  Mother hated being treated badly and living in other people's houses.  She missed her family and her daughter.  Then, in July, mother went out to dinner with father's sister and did not return to grandparents' house.  During father's incarceration, mother relied heavily on father's family for support and lived with friends.

Mother saw minor a few more times, and then, in September 2017, mother was awarded three days of visitation a month, for two hours each visit.  Mother, however, did not formally set up visits with minor until June 2018.  Between being awarded visitation and arranging for visits, mother saw minor approximately three times.  During that time, grandmother again attempted to get mother help through an organization designed to help women leave the sex trade.  Grandmother bought mother clothes and helped her apply for jobs and go to job interviews.

Father was released from prison in April 2018, and mother resumed her relationship with him. In June 2018, mother was arrested in Arizona for solicitation and pled guilty. Two months later, mother was arrested in Santa Ana, California, for loitering with intent to commit prostitution. At the time of trial, mother had outstanding warrants for these cases, as well as a case in Los Angeles, California, in which mother pled guilty to misdemeanor taking a vehicle. Father applied for visitation with minor in September 2018 but was denied. Around this time grandmother found advertisements online indicating mother was engaged in prostitution.

In May 2019, mother called grandmother in the middle of the night because father had left her in a strange neighborhood and she was scared. Mother would not tell grandmother where she was and father eventually picked up mother. Also in May 2019, mother posted advertisements indicating she was engaged in prostitution on the Internet. Mother previously told grandmother her relationship with father was "[t]umultuous [and] abusive." He once assaulted mother because she texted another man. He also pulled the car over so another woman could assault mother. Mother further told grandmother father regularly passed out from drugs and left her all night by herself in strange places. Mother told grandmother father took mother to "work" in New York and has said she "worked" for father from 9:00 p.m. until 2:00 a.m.

The most recent time mother lived with grandparents was October 2019, two months before trial. During that visit, mother told grandmother she had just returned from Los Angeles. When asked what she as doing there, mother shrugged in a way that led grandmother to believe mother was continuing to engage in prostitution. Mother also told grandmother that father had physically assaulted her in August and said he wanted to leave her. Mother said she wanted to be with father. Mother further told grandmother she "was tired of being alone. She missed her family. She missed her daughter. She wanted to leave that life behind and get help from [grandparents]." Mother was allowed

6

to stay with grandparents on the condition she seek help, but she returned to father four or five days later.

At the time of trial, minor was three years old. Mother's visitation had increased to three hours for each visit with minor. The visits were going well, although mother canceled a few times. Mother's visits with minor were always happy. Minor called mother "mommy" and was physically affectionate. Mother testified she and minor "have a bond. [Minor] knows who I am. I think it would unfair, well, for me but for her too to just cut me out of her life completely which we all know will happen. My daughter talks to me. We have a bond. We talk. She tells me she misses me. She tells me that she loves me. She knows I'm her mommy. She tells me she wants to be with [m]e . . . she'll grab like the mommy doll and daddy doll and baby, and she'll tell me baby goes home with the mommy and tells me not grandma's house. She'll tell me stuff like that. So even though she's three, she's very smart. I feel like she[']s confused with why she can't go home with mommy. She knows she's supposed to be home with mommy."

Mother has unequivocally stated to grandmother that she wants to be with father and will not leave him. Mother told grandmother she sees her relationship with father as a lifestyle choice and said many of her friends live the same life. The typical scenario has the grandparents raising the minors, while the mothers and fathers come in and out of the minors' lives for visits. Grandparents believe father is mother's pimp and has control over mother and other women. They believe mother is a victim of father. Grandparents have offered their home to mother, as well as financial support, and have encouraged her to enter a program with a living component. Grandparents would facilitate a postadoption relationship between minor and mother, but only if mother takes steps to get away from father through counseling.

Father works as a traveling barber and rap artist. His Instagram page was purely for promotion of his music. He raps about urban culture, including pimping, to appeal to his fans and to become successful. While he may rap and post on Instagram about

7

pimping, he is not a pimp. Father has a criminal record, including seven adult felony convictions, some of which involve firearms and another that included a gang enhancement. None of his convictions were for pimping. He and mother have broken up many times throughout their relationship but always get back together. He has always supported her through his barbering and music careers, even when they are not together.

Parents currently live together in an apartment with father's 13-year-old daughter. Mother usually takes care of father's daughter during the day and they have a good relationship. Mother does not have a job. Father takes care of mother and provides for his daughter and would provide for minor.[7] Mother testified father does not control her. While mother admitted to advertising for escort services, she claimed it had nothing to do with father and she was arrested during times she and father were broken up.

## B

### *Court Proceedings*

In February 2019, grandparents petitioned for adoption and sought to free minor from parental custody and control under the premise that parents had abandoned minor for more than six months without providing support or communication. Given mother's subsequent ongoing contact with minor, grandparents later sought to free minor from parental custody and control under section 1516.5.

At trial, grandparents and parents testified to the facts related above. The report compiled pursuant to Family Code section 7851 was admitted into evidence and the probation officer who compiled the report testified. In the report, the probation officer recommended "the Court grant the Petition to Declare the minor . . . free from the

---

[7]     Father was unable to prove his income. He explained his barber career was informal and, because his rap career had taken off that year, he could not provide tax documents yet. Father estimated he made $15,000 that year in music and $3,500 a week that year for barbering.

custody and control of her birth parents" under section 1516.5. "Additionally, prior to the Court finalizing an order for the termination of parental rights, it is respectfully recommended that this matter be referred to the California Department of Social Services, State Adoptions for completion of an adoption investigation. [¶] Should State Adoption ascertain that adoption in this case is appropriate, it is respectfully recommended that the Court grant the Petition of [grandparents] to adopt the minor."

The probation officer testified that when compiling the report, she interviewed both parents and grandparents at varying times. The probation officer interviewed grandparents twice -- once at her office and again during a home visit. On both occasions, the probation officer witnessed grandparents with minor. Minor appeared bonded to grandparents and called them mommy and daddy. Grandparents' home also looked appropriate for minor.

She interviewed mother and father together in her office. While the probation officer intended to interview mother and father separately, father became defensive when told the probation officer wanted to speak with mother alone. He put his hand on mother and said they had nothing to hide from each other. Father insisted he and mother be interviewed together, and mother agreed. During that interview, mother lied and said she had not engaged in prostitution since 2018.

The probation officer also interviewed mother at the apartment she shared with father. Father was not there and neither was his daughter. The apartment had one bedroom and a noticeable smell of cannabis. The apartment did not look suitable in its current state to house a three year old, and it did not appear that defendant's older daughter lived at the apartment. During the interview, mother told the probation officer she did not need help leaving the sex trade or father.

The probation officer did not know if minor was bonded to mother because the probation officer did not observe their visits or review visitation logs from mother's visits. Mother's counsel asked, "You didn't spend any time with my client and the

9

minor, and it sounds like there really wasn't much [of] an investigation into my client's relationship with her own child, how her visits go, how the minor responds to my client, whether or not it's lovingly, the questions and the conversations that my client has with her child, yet, you sit here today and you recommend to terminate my client's parental rights. [¶] Do you think that you have all the relevant information to make that determination?" The probation officer responded, "That's a fair question. And I would have to say that there's additional information that should probably go into [the report]," such as information gained from the visitation logs. The probation officer testified, however, that even if minor were bonded to mother, it would not change the probation officer's recommendation because it was not safe for minor to be with mother, without a protracted and gradual process of unification.

Following testimony and during closing argument, mother's counsel argued for the court not to place much weight in the probation officer's recommendation because the probation officer failed to investigate the relationship between mother and minor as required by statute. Mother did not object to the report or request the probation officer prepare a revised report after further investigation. Mother's counsel argued the merits of the petition and urged the court to not free minor from mother's parental custody and control.

The court granted grandparents' petition to free minor finding grandparents had proven by clear and convincing evidence the requirements of section 1516.5 (adoption by guardian) had been met. In so finding, the court analyzed the relationship between minor and parents, the relationship between minor and grandparents, and the relationship between minor and siblings. The court also noted "[t]he [p]robation [o]fficer acknowledged that it would have been relevant to review records of [mother's] supervised visitations and to observe [mother] and [minor] together during visitations. Based on [the probation officer's] testimony, the court does not rely on her recommendations to make its decision. The court is required to receive the . . . report in

10

evidence and read and consider its contents. But the court is not required to accept and follow its recommendations. [¶] It is noted that no one provided [p]robation or the court [with] records of [mother's] supervised visitations. No one presented witnesses from the supervised visitation center. The [p]robation [d]epartment prepared a report in July 2019 and a follow-up report in November 2019. There is no evidence that any party asked the court to direct the [p]robation [d]epartment observe visitations for either report. No one raised the issue in their trial briefs. The first time anyone brought up the issue was during the testimony of [the probation officer] during the fourth day of trial. [¶] The court considered this lack of information in reaching its decision. The court's findings regarding the parents and the grandparents support its decision."

Parents appeal.

## DISCUSSION

### I

*Parents Are Not Entitled To Reversal Based On The Inadequacies In The Report*

Parents contend "the court failed to ensure an adequate investigation was conducted pursuant to the specific requirements of [section 1516.5 and t]he error amounts to a violation of [parents']constitutional and statutory rights." Further, because this error resulted in prejudice, parents contend they are entitled to reversal. We conclude parents are not entitled to reversal.

Section 1516.5, subdivision (a) allows for the termination of parental rights when one or both parents do not have legal custody of the minor, the minor has been in the physical custody of the guardian for a period of not less than two years, and the court finds the minor would benefit from being adopted by his or her guardian. When determining whether the minor would benefit from adoption, the court shall consider all "factors" relating to the best interest of the child. These "factors" include the nature and extent of the relationship between the minor and birth parents, the minor and guardians, and the minor and his or her siblings. (*Id*., subd. (a)(3)(A)-(C).) To assist the court in its

11

duty, the court shall appoint an investigator "to investigate all factors enumerated in subdivision (a). The findings of the investigator . . . regarding those issues shall be included in the written report required pursuant to Section 7851 of the Family Code." (§ 1516.5, subd. (b).)

Family Code section 7851, subdivision (a) provides that an investigator "shall render to the court a written report of the investigation with a recommendation of the proper disposition to be made in the proceeding in the best interest of the child." Subdivisions (b) and (c) of that section list specific statements the report must include that are not at issue in this appeal. Family Code section 7851, subdivision (d) provides that "[t]he court shall receive the report in evidence and shall read and consider its contents in rendering the court's judgment."

Relying on *In re Noreen G.*, parents argue that, while the court made its required statutory findings, it did so based on a statutorily inadequate report. (*In re Noreen G.* (2010) 181 Cal.App.4th 1359.) Grandparents concede the report did not contain findings regarding minor's relationship with mother as required by section 1516.5, but contend parents forfeited this claim by failing to object in the trial court. Parents counter they preserved this claim because mother pointed out the inadequacies of the report during the probation officer's testimony and argued during her closing argument that the evidence did not support terminating her parental rights given the inadequacies of the report. The problem with parents' argument is that arguing to the trial court that evidence did not support freeing minor is not the same as arguing to the trial court that the court was precluded from making a determination at all. Parents never objected to the court rendering a decision on an inadequate report; instead, they relied on the inadequacies of the report to win their case. This presents the classic case of forfeiture. (*People v. Saunders* (1993) 5 Cal.4th 580, 589-590, 591, fn. 7 [the well-established general rule is that a party's failure to object in the trial court results in a forfeiture of the claim of error on appeal].)

12

Indeed, in *In re Noreen G.*, the court concluded a similar claim was forfeited. (*In re Noreen G.*, *supra*, 181 Cal.App.4th at pp. 1379-1380.) There, the report was lacking the statutorily required recommendation of the investigator under Family Code section 7851. (*In re Noreen G.*, at p. 1380.) Despite finding the parents forfeited their appellate claim the report was inadequate, the court exercised its discretion to reach the merits in light of another appellate claim that counsel was ineffective for failing to object to the inadequate report. (*Id.* at pp. 1379-1380.) Here, parents do not claim counsel was ineffective, nor could they. The record clearly demonstrates mother's counsel had a tactical decision to defeat grandparents' petition on the theory grandparents did not prove it was in minor's best interest to be freed from parental custody and control. (*People v. Hinton* (2006) 37 Cal.4th 839, 876 [we defer to counsel's reasonable tactical decisions when assessing an ineffective assistance of counsel claim].)

Instead, parents argue we should exercise our discretion because the issue presents one of law, where we need not refer to the record or particular facts of this case. (See *In re Sheena K.* (2007) 40 Cal.4th 875, 889.) To the extent parents' case presents a question of law, the question is whether the court erred under section 1516.5 by receiving the report into evidence without it containing findings regarding minor's relationship with mother. The answer, without resort to the record, is that the trial court erred. In *In re Noreen G.*, the court held that noncompliance with the enumerated statutory requirement that the investigator make a recommendation constituted procedural noncompliance with the statute and was error. (*In re Noreen G.*, *supra*, 181 Cal.App.4th at p. 1380.) Section 1516.5 requires additional findings to the report prepared under Family Code section 7851. (§ 1516.5, subd. (b).) One of those findings is the nature and extent of the relationship between the minor and the biological parents. (*Id.*, subd. (a)(3)(A.) Grandparents concede that required finding, at least as to mother, was not in the report. Thus, like *In re Noreen G.*, the failure of the report to contain an enumerated statutory requirement constitutes procedural noncompliance with the statute.

13

The error, however, is not of a constitutional nature. In *In re Crystal J.*, the court rejected the mother's claim that "the deficiencies in the assessment reports constituted a violation of procedural due process." (*In re Crystal J.* (1993) 12 Cal.App.4th 407, 412.) In dicta, the court stated: "Where an investigative report is required prior to the making of a dependency decision, and it is *completely* omitted, due process may be implicated because a cornerstone of the evidentiary structure upon which both the court and parents are entitled to rely has been omitted." (*Id.* at p. 413.) But the court concluded: "Where . . . the assessment report *is* prepared, *is* available to the parties in advance of the noticed hearing, and *does* address the principal questions at issue in the particular proceeding, errors or omissions in the report cannot be characterized in terms of denial of due process. [Citations.] Deficiencies in an assessment report surely go to the weight of the evidence, and if sufficiently egregious may impair the basis of a court's decision to terminate parental rights. Such deficiencies, however, will ordinarily not amount to a deprivation of procedural due process." (*Ibid.*)

We conclude that is the case here and no due process violation occurred. Like in *In re Noreen G.*, where the court concluded there was no constitutional violation, here parents received the report and were given the opportunity to cross-examine the investigator about its inadequacies. (*In re Noreen G.*, *supra*, 181 Cal.App.4th at pp. 1380-1381.) Thus, "[t]his is not a case in which the parties' due process rights were violated because they did not receive the report or no investigation was conducted." (*Id.* at p. 1381.) While the report lacked findings regarding minor and mother's relationship, the report contained the facts of minor's history, including how she came into grandparents' custody and why she remained there. These facts are targeted at the principal question at issue -- the best interest of minor. Thus, the report was not so lacking that it amounted to a due process violation.

Parents' reliance on *Guardianship of Ann S.* is misplaced. (*Guardianship of Ann S.* (2009) 45 Cal.4th 1110.) There, our Supreme Court held section 1516.5 did not violate

14

due process on its face. (*Guardianship of Ann S.*, at p. 1126.) In doing so, our Supreme Court recognized the statute was intended to address the situation "where one parent cannot be found, and the other voluntarily gave the child to the guardian in a written guardianship agreement that may or may not have been entered in a formal court proceeding. Years later it became apparent that the child has bonded with the guardians as parents, but since the birth parents visited occasionally, abandonment could not be established. Another example . . . is where a drug addicted mother gives the child in guardianship, hoping to get herself rehabilitated but repeatedly fail[s], creating a situation where the child is in the custody of the guardian for years without being in the foster care system. . . . [I]n either case, a guardian should be able to adopt the child without having to obtain consent or prove neglect, abandonment, or the mental disorder or mental illness of the parent who gave them [*sic*] guardianship in the first place." (*Id.* at p.1125, fn. omitted.) Parents rely on this language to argue, that because their case is not one of the examples cited by our Supreme Court, their due process rights were violated. Not so. While our Supreme Court recognized the situations the statute was designed to address, the rule it announced was that "due process is satisfied if unfitness is established at an earlier stage, and parental rights terminated later based on the child's best interest." (*Id.* at p. 1134.) Parents do not argue that did not occur here.

Because the error was not of a constitutional nature, "[r]eversal is appropriate 'only if we conclude ". . . it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." ' " (*In re Noreen G.*, *supra*, 181 Cal.App.4th at p. 1381.) We conclude parents cannot show prejudice.

When assessing minor's relationship with mother, the trial court did not rely on the report. Instead, it relied on the trial testimony. As the court summarized, the testimony established mother "has a relationship with [minor]. During [minor's] first year, [mother] showed modest interest in her daughter but not to raise her. After getting limited court-ordered visitation, [mother] did not exercise it at all for months.

15

[Grandmother] allowed [mother] some informal contacts with [minor] but there were significant gaps in her efforts and contacts." Mother "continued to have only supervised [visits] of two hours per week during the first three weeks of the month until eight months after this action was commenced. Then, her supervised visits increased to three hours per week. [¶] No evidence was presented to show what efforts [mother] made to expand her visits beyond supervised visitation. No evidence was presented to show what the family court expected her to do to get unsupervised visits."

The court's focus was on mother's lack of commitment to become minor's caregiver in the reasonable future. On that point, in addition to mother's complacency in seeking custody, the court noted mother did not make strides to put herself in a position to care for minor. Mother was unemployed and completely dependent on father. Parents were involved in an abusive and unstable relationship. While mother said father adequately supported her, even when they were not together, the court found father's description of his income untruthful. Further, the court found mother continued to engage in prostitution. In mother's case that included trips out of state and to Southern California. She was arrested multiple times for this conduct and failed to resolve matters in those cases. The complacent and unstable nature of mother's relationship with minor proved to be detrimental to mother's argument against freeing minor from parental custody and control. Thus, even if the report included findings corroborating mother's testimony that her relationship with minor was loving and their supervised visits went well, it is not reasonably probable a result more favorable to mother would have been reached. Thus, the error was harmless.

## II

### *The Trial Court Acted In Minor's Best Interest*

Parents contend terminating parental rights before completion of the adoption investigation was not in minor's best interest. Specifically, they argue sufficient evidence does not support the court's order because there were serious questions related to

grandfather's prior criminal offense, his anger problems, and his disciplinary style that would have been thoroughly addressed by the adoption investigation.  While parents present this as one issue, it is actually two -- one attacking the sufficiency of the evidence and one attacking the court's ruling without benefit of the adoption investigation.

We conclude the latter of these arguments, regarding the adoption investigation, is forfeited.  Parents never objected in the trial court to the court rendering a decision without benefit of the adoption investigation.  (See *People v. Saunders*, *supra*, 5 Cal.4th at pp. 589-590, 591, fn. 7)  Further, parents point to no authority on appeal demonstrating the trial court had a duty to consider the adoption investigation or argue why the failure to consider such a report violated their statutory or constitutional rights.  (See *Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956 [" '[t]he absence of cogent legal argument or citation to authority allows this court to treat the contention as waived' "].)

Parents' attack on the sufficiency of the evidence similarly fails.  Our Supreme Court recently held that "appellate review of the sufficiency of the evidence in support of a finding requiring clear and convincing proof must account for the level of confidence this standard demands. . . .  [W]hen reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true.  Consistent with well-established principles governing review for sufficiency of the evidence, in making this assessment the appellate court must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995-996.)

Parents contend the evidence presented provided sufficient concerns regarding grandfather's prior offense, his anger problem, and disciplinary style to call into doubt his

fitness to adopt minor.  Not so.  The court explicitly addressed parents' concerns regarding grandfather's alleged anger problems and disciplinary style.  Specifically, "[t]he court believe[d] that [mother] exaggerated her past with her father and that his use of physical discipline was not used excessively.  Her allegations of domestic violence between [grandmother] and [grandfather] are of concern and unclear.  [Mother] testified about several incidents that she did not mention to the [p]rotation [o]fficer.  All the allegations [of] domestic violence occurred over ten years ago.  In considering all of the evidence on this issue, the court believes that it does not undermine the finding of benefit to [minor] from being adopted by [grandparents]."  Similarly, grandfather's conviction occurred over a decade prior and the circumstances leading to his misdemeanor conviction, as testified to by grandfather, do not undermine the benefit to minor from adoption.  Given the trial court's findings regarding grandfather's and mother's credibility, findings to which we must defer, parents are unable to undermine the court's ruling.

## DISPOSITION

The order granting grandparents' petition to declare minor free from parental custody and control is affirmed.


/s/
Robie, J.


We concur:


/s/
Hull, Acting P. J.


/s/
Renner, J.


18