Filed 12/5/24  In re T.J. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| In re T.J., a Minor. | C101206 |
| G.P. et al., | (Super. Ct. No. 23AB00062) |
| Petitioners and Respondents, | |
| v. | |
| C.S., | |
| Objector and Appellant. | |

Appellant C.S. (mother) appeals from the family court's May 2024 order terminating her parental rights over the minor T.J. (the minor) under Probate Code section 1516.5,[1] pursuant to a petition filed by maternal grandmother G.P. and maternal stepgrandfather N.P. (individually, grandmother and grandfather; collectively grandparents).  We will affirm.

---

[1]     Undesignated section references are to the Probate Code.

FACTUAL AND PROCEDURAL BACKGROUND

The minor began living with grandparents on April 12, 2020, when he was approximately six months old.  Grandparents were appointed as the minor's temporary guardians on April 13, 2020, and guardians on November 18, 2020.  The record on appeal does not include those proceedings, and they are not at issue here.

A.  *Petition to Terminate Parental Rights and Court Investigator Report*

On May 18, 2023, grandparents filed a petition to terminate the parental rights of mother and father[2] (termination petition).  The termination petition alleged the parents had surrendered custody of the minor to the guardians (i.e., grandparents) and exercised no parental care or control for at least two years.  In response, mother petitioned for visitation in July 2023, and petitioned to terminate the guardianship in August 2023.[3]

In July 2023, the juvenile court investigator filed a "[f]ree the minor from custody & control of parent report & recommendation" urging the court to grant the grandparents' termination petition.  (Boldface & capitalization omitted.)  According to the report, mother had not seen the minor since February 2023, and father had not been in contact with the minor since April 2020.  Grandparents wanted to provide stability for the minor.

B.  *Contested Hearing*

The contested hearing took place between October 2023 and February 2024.  The family court heard testimony from the juvenile court investigator, grandparents, mother, mother's friend, and maternal aunt.

1.  *The Minor's First Six Months*

Mother, who had two other children ages 13 and 17 at the time of the hearing, found out she was five months pregnant with the minor when she was hospitalized after

---

[2]    Father is not a party to this appeal.

[3]    Neither of mother's petitions is at issue in this appeal.

overdosing on methamphetamine. She had lost her home in a wildfire in November 2018, and was homeless when she gave birth to the minor in September 2019.

Grandfather testified that, in an effort to help mother "get back on track," grandparents let mother and the minor live with them for the first few months of the minor's life. There was conflicting testimony regarding who the minor's primary caregiver was during this time. Grandmother testified that she primarily cared for the minor when she wasn't working, and mother was "aloof a lot to him." In contrast, mother and grandfather testified that mother was the minor's primary caregiver while she and the minor stayed with grandparents, and mother contributed by purchasing groceries. Mother said she also contributed to paying the utilities.

There was conflicting testimony about why mother eventually moved out with the minor. Grandfather said he and his wife asked mother to move out in October 2019 after they discovered mother had violated their house rules by having her ex-boyfriend visit while grandparents were away at work. The maternal aunt, who was estranged from mother at the time of the hearing, claimed mother moved out because she grew angry and argumentative with grandparents. Maternal aunt assumed these "mood swings" were due to alcohol. According to mother, she moved out because she and grandparents got into an argument when mother asked grandparents to look after the minor while she went to resolve a "ticket." The argument escalated, and grandfather called the police, who advised mother to move out.

Mother said that, upon leaving grandparents' home in October 2019, she initially stayed in a hotel and then moved to a live-in substance abuse program designed for mothers with babies. She soon left the program because she was watching everyone else's children. Mother denied that she moved into the program because of a substance abuse issue. She then went to live in a nearby town.

According to grandfather, mother left the minor with grandparents three times between March and April 2020, although mother claimed it was only twice. According

3

to grandfather the first time mother arrived at grandparents' house she was behaving "erratic[ally]." She said she needed to leave the minor with them because there were people after her, trying to "beat her up." She returned two days later to pick up the minor.

The second time mother drove with the minor to grandparents' house she appeared drunk, and she handed the minor to grandparents. An adult passenger in the car confirmed they had been drinking whiskey. Mother appeared the next day to retrieve the minor. This led the grandparents to petition for guardianship of the minor. Mother testified she only had one drink that night and claimed grandparents refused to return the minor until police arrived.

According to grandfather, on April 12, 2020, mother called grandmother and said she needed to move because people were after her and trying to "beat her up." When mother arrived at their home, she appeared high or drunk and was "freaking out." Over grandparents' objections, mother handed the minor to grandmother, said they needed to watch him, and left. There was no discussion, and mother left no supplies for the minor.

Mother testified that she had argued that day with a family member who then "decided to jump [her]." She asked grandmother to take the minor because she needed to start over, and she was not sure how long it was going to take. Mother claimed she offered to pay them, but she did not bring any supplies because there were still clothes and diapers from her stay with them, and grandparents already had everything they needed, except for formula. She testified she never intended to leave the minor there permanently and had thought it would only be for a few days, and no more than a month. Mother claimed grandmother agreed to care for the minor.

Mother testified that, although she had intended to return the following morning, she was unable to do so because she was arrested for resisting a police officer and for being under the influence of a controlled substance. Mother claimed she subsequently tested negative for any substance. Although mother said she had returned to pick up the

4

minor right after she was released two days later, grandfather claimed it had taken four or five days. According to grandfather, mother tried to apologize, but he asked her to leave because, by that time, they had been granted temporary guardianship. Grandfather threatened to call the police, and mother left.

### 2. *Visitation*

Although the record is unclear as to whether the temporary custody order addressed visitation between mother and the minor, mother testified that grandparents refused to let her visit with the minor between April and July 2020, despite her daily requests. On the other hand, grandmother claimed mother never asked for visits during this time. In July 2020, the family court ordered twice-weekly video visits between the minor and mother.

Mother said she sometimes had trouble connecting to the visits due to weak cell phone reception. Still, she attended all the visits she was able to, and she claimed the visits went well. The minor was engaged as they read books to each other, did crafts, danced, and sang. The minor recognized mother and smiled at her, and he would wave or kiss goodbye at the end of the visits.

Grandfather testified that, although the visits initially went well, they went "downhill" after about six months. According to grandmother, mother had been showing up late or not at all for the video visits, so grandmother reduced the visits to once a week starting in March 2021. Mother seemed fine with the reduced schedule.

According to grandmother, in April 2021, mother said, "[N]o more Zoom," which grandmother interpreted to mean mother refused to participate in any more video visits. Instead, mother asked for in-person visits. Grandmother was uncomfortable with in-person visits unless they were supervised, and she advised mother she would need to go to court to revise the visitation order. The video visits ceased in either April or June 2021. Mother claimed she had asked to switch to in-person visits because the minor was acting out during the video visits.

5

The minor had very little contact with mother after the video visits stopped, with mother and grandmother only exchanging photos via text message once a month. Grandmother stopped sending photos in May 2023, once the grandparents filed the termination petition.

According to grandmother, in the time since the video visits ended, mother had only asked four times to see the minor. In contrast, mother testified she consistently asked to see minor for about three months after the video visits ended, but she then reduced her communication because grandparents threatened to call the police and seek a restraining order. According to mother, grandparents often threatened to get the police involved when they wanted to end communications. Mother also said grandparents expressed concern that mother was refusing to attend religious meetings. Mother said she was firm with them about resuming visits, but she denied being aggressive during the visits. In mother's opinion, grandparents had failed to keep mother informed about the minor's life. Mother said she eventually stopped asking for any response from grandmother because she did not want to "fight" anymore.

During her testimony, mother was asked why she waited until July 2023, or two years after the video visits had stopped, to ask the family court to modify visitation. She responded that she had been busy with the minor's younger half-siblings A. and E.,[4] who were born in 2021 and 2022, respectively, and then with dependency cases involving A. and E. She also "wanted to be grounded" before reunifying with the minor. Mother also pointed out that she did not start researching her legal rights until September 2022.

---

[4]      To protect their privacy, we refer to the minor's half-siblings by their first initials. (Cal. Rules of Court, rule 8.401(a).)

6

### 3. Guardianship Order and Mother's Current Wishes Regarding the Minor's Care

Mother testified that the family court granted guardianship to grandparents in November 2020 over her objection. Yet, during the guardianship hearing, when asked what she wanted, mother responded, "I'd like [grandmother] to keep [the minor]. She has room, and [she] loves [the minor], and [the minor] loves her." Mother also said she had wanted to obtain permanent housing before resuming custody of the minor. According to the mother, the court granted guardianship because mother had pending criminal charges and a history of domestic violence with the minor's father.

Mother testified she currently wanted to maintain her parental rights but still leave the minor in grandparents' care. Mother acknowledged that removing the minor from grandparents' care would "hurt his heart." Grandmother testified mother had said she only opposed the termination petition because she thought it would hurt her chances with her pending dependency cases involving A. and E., and any future children.

### 4. The Minor's Bond with Mother and Mother's Offers of Financial Support

Mother testified that, although she had not visited with the minor since he was nearly two years old, she had formed a bond with the minor and the two were "very, very close." Grandfather acknowledged that the minor recognized mother and had "developed" a "rapport" with her during the video visits. Mother's friend, who observed many of the video visits between mother and the minor, described mother as a loving parent who communicated well with her children.

Mother said their strong bond was demonstrated in September 2022, when the minor recognized her when he unexpectedly saw her and A. in a park. According to mother, the minor approached her, with grandmother in tow, and began fussing as grandmother tried moving them to another spot. Grandmother described the encounter differently, testifying that it was she who saw mother. According to grandmother, mother

7

appeared "out of sorts" and unclean. The minor did not recognize mother when mother said hello. Mother had not seen the minor since.

Mother said she had paid child support in the past but was not doing so now because the state was doing so on her behalf. Mother had also offered additional financial support outside of the child support order, approximately six times during the guardianship. Mother also sent toys and supplies directly to grandparents, but grandparents declined her offers of support.

5.    *Mother's Alleged Mental Health, Drug Use, and Domestic Violence Issues*

Grandmother testified she was concerned about mother's mental health. In addition, mother had been in a string of abusive and violent romantic relationships that also involved drugs. Although grandmother did not specify dates, she claimed mother had previously slapped grandmother, yelled at the minor and his older half-siblings, and "rage[d]" at other people. Police were called five times between September 2019 and April 2020, including one time when mother started screaming that it was grandmother's fault that mother would "lose" the minor.

Grandmother also testified she believed mother abused alcohol and drugs, and she had seen mother under the influence of methamphetamine three times: once when mother overdosed at age 17, once in 2015, and once in 2022. Grandfather said he had found methamphetamine pipes when cleaning out the home of mother and her ex-husband. The maternal aunt explained that, although she had never seen mother drink alcohol or use illicit drugs, she had smelled alcohol on or near mother.

Mother responded that she had undergone multiple mental health assessments between 2009 through 2018, and more recently in 2022, and she had never been referred for mental health or substance abuse services. She had participated in counseling between 2004 and 2018 but had stopped. In addition, she has been in a steady relationship with her current husband since the summer of 2021. They had been living

together in an apartment for two and a half years, she owned her own business, and there were no incidents of domestic violence. Mother acknowledged that she had filed for a domestic violence restraining order against her husband in January 2022, stating that: (1) her husband had threatened to stab her and (2) she had found child pornography on his cell phone. Mother testified she "dropped" her request because she realized he was not threatening her, and she found out the pornography allegations were untrue.

Mother also denied having a substance abuse issue. While acknowledging that she intentionally used methamphetamine and marijuana when she was 17 years old, mother denied overdosing at the time, claiming she actually suffered a panic attack, leading to her diagnosis of an anxiety disorder. Mother acknowledged that she discovered she was five months pregnant with the minor only because she was taken to the hospital after ingesting methamphetamine. However, according to mother, the ingestion was unintentional. She claimed a co-worker had added methamphetamine to her own water bottle, and mother had mistakenly drunk out of the co-worker's water bottle. Mother testified she tested negative for drugs a week before and at the time of minor's birth. However, medical records indicated THC was present in the umbilical cord at the time of the minor's birth. Mother denied consuming marijuana while she was pregnant with the minor.

According to mother, she next tested positive for drugs when E. was born in 2022. Mother claimed she tested positive for amphetamines because she ingested half of a pill that was used to treat ADHD. Although mother said she suffered from ADHD, she acknowledged she did not have a prescription for the drug. Mother said she had not consumed alcohol since just after E.'s birth. She currently avoided any illegal drugs and had 15 negative tests for amphetamines between September and December 2022. Mother's friend testified she had only seen mother drink two beers and had never seen mother use methamphetamine or marijuana.

9

6. *The Minor's Relationship with Grandparents and Extended Family*

The maternal aunt described the minor as "smart," "loving," and "fun." He was "healthy, happy[,] and thriving and he loves [grandparents]." His daily needs were being met, and he always told grandparents he loved them and gave them a big hug. The minor regularly saw the maternal aunt and her children (i.e. the minor's cousins), and he participated in extended family celebrations. The minor did not have a relationship with his younger half-siblings.

Grandfather testified that the minor was in good health and called them "Papa" and "Grandma." Grandmother testified that the minor said he wanted to be with grandmother "forever." She was unsure if she was willing to facilitate a relationship between the minor and his two younger half-siblings. She was also unsure about any future relationship with mother.

7. *Closing Arguments*

The family court heard closing arguments from the parties, with counsel for mother, father, and the minor recommending the court deny the grandparents' termination petition. Grandparents argued they wanted to adopt the minor and he deserved to be in a family that loves him.

C. *Family Law Court's Decision*

In its May 2024 written order, the family court noted the lone issue here was whether the minor would benefit from being adopted by his guardians. Citing section 1516.5, subdivision (a) and *Guardianship of Ann S.* (2004) 45 Cal.4th 1110, 1132, the court noted it was required to consider " 'all factors relating to the best interest of the child, which would include the circumstances leading to guardianship, the parent's efforts to maintain contact with the child, any exigencies that may have hampered those efforts, and other evidence of commitment to parental responsibilities.' " The court noted mother had not cared for the minor or occupied a substantial parental role since the minor was seven months old. Although she had sporadically visited the minor just after the

10

guardianship was granted, she had no contact for one to two years, other than the "unexpected interaction" at the park. Meanwhile, the minor had been with grandparents for over four years, and he looked at them as his primary caregivers. The minor had also developed a relationship with some of the grandparents' other family, including his older half-siblings who reside with their father. Yet he had been unable to develop a relationship with his younger half-siblings, in part because those children were currently dependents of the juvenile court.

Mother had tested positive for alcohol, methamphetamine, and marijuana at various points in her life, including before and shortly after giving birth. The family court did not find mother's explanation that she accidentally ingested methamphetamine while she was pregnant with the minor credible. Although mother clearly loved and had affection for the minor, she had no contact with the minor for a "substantial period of time." It was only after grandparents filed their petition to terminate her parental rights that she filed her petitions for visitation and for terminating the guardianship. Under the circumstances, mother's "commitment to any parental responsibilities ha[s] been minimal."

Although grandparents appeared to be "strict" and "rigid" in interacting with mother and some other family members, this did not "affect[ ] the other evidence presented in this case." The minor needed a stable home, and grandparents were the only parents the minor had ever known. In addition, mother had failed to completely address the issues that led to the guardianship, "as evidenced by the fact that she does not have any of her five children in her care." Father had also been absent during the minor's entire life. Because the minor would benefit from being adopted by grandparents, the family court terminated mother and father's parental rights pursuant to section 1516.5, subdivision (a).

Mother timely appealed.

11

DISCUSSION

I

A. *Legal Background*

Section 1516.5, subdivision (a) provides: "A proceeding to have a child declared free from the custody and control of one or both parents may be brought . . . in a separate action filed for that purpose, if all of the following requirements are satisfied: (1) One or both parents do not have the legal custody of the child. (2) The child has been in the physical custody of the guardian for a period of not less than two years. (3) The court finds that the child would benefit from being adopted by his or her guardian."

Section 1516.5 "requires the court to consider 'all factors relating to the best interest of the child,' . . . includ[ing] the circumstances leading to guardianship, the parent's efforts to maintain contact with the child, any exigencies that might hamper those efforts, and other evidence of commitment to parental responsibilities." (*Guardianship of Ann S., supra*, 45 Cal.4th at p. 1132; see also § 1516.5, subd. (a)(3) [also requiring courts to consider the nature and extent of the child's relationship with the birth parents, the guardian and the guardian's family, and any siblings or half-siblings].) However, there is no requirement to show parental unfitness or that terminating parental rights is the least detrimental alternative for the child. (*In re Noreen G.* (2010) 181 Cal.App.4th 1359, 1383.)

We review the family court's findings under the clear and convincing evidence standard. (*Guardianship of Ann S., supra*, 45 Cal.4th at p. 1127, fn. 9.) At issue is "whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011.) We "must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Id*. at pp. 1011–1012.)

12

B. *Analysis*

Here the first two elements of section 1516.5—the parents do not have legal custody over the children and the children have been in the physical custody of the guardian for not less than two years—are undisputed. Mother acknowledges that the only issue here is the minor's best interest.

Mother contends the family court erred in determining it was in the minor's best interest to terminate her parental rights. According to mother, she did not originally consent to the guardianship, and she had taken steps to terminate it. In addition, grandparents had hampered her attempts to visit with and develop a relationship with the minor, and it was not her fault that she was unable to foster a close relationship with him. Mother further argues that grandparents' interference meant there was insufficient evidence that would enable the family court to assess her relationship with the minor accurately, and it was therefore "[u]njust" to terminate her parental rights. We reject mother's arguments because the family court's findings are supported by substantial clear and convincing evidence.

The evidence shows that, for more than four years, grandparents have provided a loving, nurturing, and stable home for the minor. The minor, who was only six months old when mother left him with grandparents, was "healthy, happy[,] and thriving" in the only home he had known his entire life. The parents have been unable or unwilling to provide such a home. The minor told grandparents he loved them and said he wanted to be with grandmother "forever." The minor also developed a relationship with his extended family, participating in family celebrations and regularly seeing the maternal aunt and his cousins. That alone is sufficient evidence to support the family court's order.

Mother points to her testimony from the termination petition hearing that, in April 2020, she never intended to leave the minor with grandparents permanently. However, substantial evidence indicates otherwise. Mother acknowledged she left the minor with

13

grandparents in April 2020 because she needed to "start over," and she was unsure "how long it's going to take." In addition, during the contested guardianship proceedings, she told the family court that she wanted grandmother to keep the minor, since grandmother had room, the minor loved grandmother, and mother lacked permanent housing. Most tellingly, though, mother waited until August 2023 to seek to terminate the guardianship, even though she claimed to have been in a stable romantic relationship and living situation for at least two and a half years and now ran her own business. Mother said during the proceedings at issue here that, although she hoped to maintain her parental rights, she wanted to leave the minor in grandparents' care. Given that mother waited nearly three years to seek to terminate the guardianship and testified minor should remain with grandparents, it was reasonable for the family court to conclude that mother had a minimal commitment to her parental responsibilities.

Although mother may have loved the minor and claimed to be "very, very close" with him, substantial evidence indicates she had no contact with the minor for a substantial period of time. To the extent mother "developed" a "rapport" with the minor during their video visits, those ended in April or June 2021, when the minor was less than two years old. The next time mother had any contact with the minor was more than a year later, during their chance encounter in a park in September 2022. Although mother claimed the minor recognized her, it was reasonable for the family court to credit grandmother's testimony that he did not. As such, it was reasonable for the family court to infer that mother had a minimal relationship with the minor.

To the extent mother is arguing the family court should have considered as a mitigating circumstance and weighed more heavily her strained relationship with grandparents or their role in the end of her visits with the minor, we disagree. The evidence at best indicates that, after the visits ended, mother only spent three months asking grandparents to see the minor. Even though grandparents advised mother she would need to go to court to change the visitation order, mother failed to do so until July

2023.  Being busy with the minor's younger half-siblings and any pending dependency cases did not justify her decision to wait more than two years to seek the family court's help in either enforcing or modifying the visitation order.  Despite mother's arguments, it was not unreasonable for the court to infer that mother had made minimal efforts to maintain contact with the minor.

In sum, when viewing the evidence in a light most favorable to the judgment, there is substantial evidence of the minor's strong relationship with grandparents and limited evidence of his relationship with mother.  Applying the elevated clear and convincing standard, we find that substantial evidence supported the family court's finding that adoption was in the minor's best interest and the decision to terminate mother's parental rights.

### DISPOSITION

The orders terminating mother's parental rights are affirmed.

_____\s\_____,
Krause, J.


We concur:


_____\s\_____,
Duarte, Acting P. J.


_____\s\_____,
Wiseman, J.*

---

\*      Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.