Filed 2/4/25  Adoption of J.S. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| Adoption of J.S., a Minor. | |
| ALMA V.,<br><br>  Plaintiff and Appellant,<br><br>v.<br><br>JAMIE F.,<br><br>  Defendant and Respondent. | G064354<br><br>(Super. Ct. No. 22AD000252)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Mary Kreber Varipapa, Judge. Affirmed.

Baron Legal and Brian W. Baron, for Plaintiff and Appellant.

Brent Riggs, under appointment by the Court of Appeal, for Defendant and Respondent.

\*          \*          \*

Alma V. (the grandmother) appeals from an order denying her petition for freedom from parental control and custody (the petition) as to her granddaughter, J.S. J.S.'s mother, Jaime F., had left J.S. in the grandmother's custody for approximately three years, since J.S. was approximately 21 months old, under a temporary guardianship. The probate court denied the petition.

The grandmother argues the court should have granted her petition. The grandmother fails to set forth all of the pertinent facts under the relevant standard of review and misapplies that standard of review. We conclude there was substantial evidence to support the court's decision to deny the petition, and therefore we affirm the order.

STATEMENT OF FACTS AND PROCEDURAL HISTORY

J.S. was born in November 2017. She was released to Alma[1] from the hospital due to the mother's substance abuse. Jaime asked Alma to take custody of J.S. because Jaime did not want J.S. to be in the juvenile dependency system.

Alma was granted guardianship in December 2017. Visitation for Jaime was at Alma's discretion.

Jaime filed a petition to terminate the guardianship in September 2022, which the court denied. The court ruled that termination was premature due to inconsistent contact between Jaime and J.S. The parties were ordered to mediation pursuant to their agreement in order to establish a plan for Jaime and J.S. to maintain contact. Mediation resulted in

---

[1] Alma's son, A.S., is J.S.'s father. He did not object to Alma's petition and is not part of this appeal. He was incarcerated at the time J.S. was born.

an agreement with respect to contact. Pursuant to that agreement, Jaime was permitted four hours of visits per week and daily phone calls. Alma, A.S., and Jaime agreed to drug test, with a urinalysis for Alma and follicle tests for both parents.

In December 2022, Alma filed the instant petition. The grounds for the petition were Family Code section 7822, alleging abandonment, and Probate Code section 1516.5.[2] She also filed a notice of pending adoption proceedings, and a request to consolidate the guardianship and adoption petitions and stay the guardianship proceedings. She had not, at that point, filed an adoption request or initiated a home study.[3]

Both Alma and Jaime spoke to an investigator from Family Court Services in connection with the petition. The report the investigator produced was dated December 2022.

Alma reported that she worked full time as a caregiver, typically from 10 p.m. to 6 a.m. During that time, childcare was provided by J.S.'s paternal uncle or Alma's 80-year-old mother. She was currently unmarried and had five adult children. She denied any substance abuse, child abuse, domestic violence, or criminal activity. She reported Jaime had not visited J.S. since 2019. She denied that the father, A.S., resided in her home. She believed the father was currently sober, but he had not complied with the mediation agreement to complete a follicle test. She stated this was due to "'lack of an order and time.'"

---

[2] Subsequent statutory references are to the Probate Code unless otherwise indicated.

[3] Alma filed an adoption petition much later, in January 2024.

According to Alma, J.S. had anxiety, but she was unable to provide a diagnosis or the name of J.S.'s treating physician. When asked again for that information, she stated there was "'no official diagnosis'" but said J.S. had been prescribed medication. She could not recall the name of it.

J.S. also had an unspecified eating or gastroenterological disorder. Alma stated she had a specialist at St. Joseph Hospital, but was unable to provide the doctor's name.

Alma stated J.S. did not attend preschool or other extracurricular activities, but went to church and played with other children. She described J.S. as having "'extreme separation anxiety'" but also being "'very independent.'"

With respect to visits as agreed to at mediation, Alma claimed she had not agreed to it. She did not claim she had complied with the mediation agreement with respect to contact.

When first asked, Alma stated she had not made any long-term plans for J.S. in the event she was no longer able to care for her. When asked the same question later, she said her daughter, a single parent, would take her, or her son would take her.

J.S. could not be interviewed. The investigator's report stated: "[T]he child was briefly observed in the presence of [Alma]. It is unknown if the child prefers to live with [Alma], . . . . It was apparent the child looked to [Alma] for direction and only responded to the undersigned when instructed. When asked direct questions by the undersigned the child, shrugged, spoke inaudible or looked to [Alma]. [Alma] was observed making leading statements and questions to the child about her name, songs and making videos. Of concern to the undersigned was the child's reported continued use of a pull-up at the age of five, her non-enrollment in pre-school or

4

Kindergarten for socialization and the inability for the petitioner to provide the undersigned with the name and telephone numbers of her healthcare providers who are treating her alleged digestive and anxiety issues."

Jaime was interviewed. She admitted being "'under the influence'" at the time of J.S.'s birth. She voluntarily placed J.S. in Alma's care. Jaime reported she had been sober since May 2020, the date she entered a four-month residential rehab program. She completed the program successfully. She had a substance abuse sponsor who she spoke to on a regular basis. She had been employed at a grocery store for approximately two years, working a full-time, variable schedule. She was not in a relationship and had lived in the same apartment in Indio for two years with her two other children, a 15-year-old, A., and a three-year-old, D. Pursuant to the mediation agreement, she had submitted to a hair follicle test and was awaiting the results. She denied any history of domestic violence or mental health concerns. She attended therapy, anger management, and parenting classes as part of her recovery. She acknowledged a conviction for receiving stolen property and stated she was on formal probation until 2023. She was compliant and in good standing.

Jaime admitted a juvenile dependency case as to her younger child, D., who was born in January 2020 with positive toxicology. Both A. and D. had ultimately been placed in foster care as a result. The case was closed with exit orders. The dependency termination report, dated 2021, stated the risk to the children, if dependency was terminated, "'is low.'" Currently, she had shared physical custody of D. with D.'s father and sole custody of A.

Jaime showed the investigator a timeline of visits using dated photographs from her cell phone. She visited seven times each in 2018 and 2019. She had two video visits in 2020. In 2020, the dependency case occurred

5

involving her two other children, and she entered substance abuse treatment. Thereafter, she reported Alma closed her social media account, ending Jamie's ability to communicate with her or J.S., leading to no visits in 2021 or 2022. In July 2022, she unsuccessfully petitioned to dissolve the guardianship.

Acknowledging the existence of a child support order, Jaime stated she had started paying in 2022.

Jaime believed Alma provided the father access to J.S., which Jaime found concerning. She "expressed serious concern for the child's safety and well-being while under his supervision and care." She did not believe the father was currently sober, and alleged that family members had observed him buying drugs. She also expressed serious concern about J.S.'s eating disorder and that she was not attending school at five years old. Alma did not allow Jaime to attend doctor's visits, nor did she supply her with doctors' names or telephone numbers before the mediation process. With respect to visits, Jaime stated that Alma had not complied with the agreement at all, stating Alma had not allowed her any visits. Documentation gathered by the investigator supported Jaime's claims.

Jaime was aware that the court "'was not just going to give [J.S.] right back. I just want a chance to develop a relationship. She has sisters. This is supposed to be what's best for her [J.S.] not for me or [Alma]. I just want a chance to be her mom.'"

The investigator's report stated: "[Alma] believes it is in the minors' best interests to be freed from the natural mother's parental custody and control. Throughout her interview, [she] expressed serious concern regarding the natural mother's history of substance abuse, her contact with the Riverside County Juvenile Dependency Court, her ability to care for the

6

child while ensuring her safety and this Court's ability to protect the child. The child has been in her care since birth and she maintained the natural mother has had no contact with the child since 08/27/2019."

Jaime, the report noted, was "strongly opposed to the petition and any adoption request. She plans to attend the hearing scheduled for 12/19/2022. [She] denied abandoning the child at any time and provided a picture timeline of visits between 2017 and 2019. She acknowledged her last visit occurred with the child in 2019, however maintained it was a result of her entering treatment and [Alma] abusing her discretion with regard to visitation. She maintained [Alma] unilaterally suspended all visits and communication between her and the child, which brought her to the probate court to request a dissolution of the guardianship. This resulted in the probate court ordering its own investigation and sending the parties to mediation, which she attended.

"[Jamie] appears to be stabilized at this point, . . . documentation was provided that supports her employment, substance abuse treatment and successful completion of her juvenile dependency matter. She reported her sobriety date as 05/17/2020 and recently submitted to a hair follicle analysis per the Probate Court mediation agreement. The natural mother expressed a desire to reintroduce herself, resume contact with the child and cultivate her maternal role. She is aware the process cannot happen all at once and is prepared to accept a step-up plan."

The evaluator opined: "Mitigating factors such as the mother's in-patient substance treatment, dependency case and [Alma]'s gatekeeping, have limited and/or eliminated her ability to exercise frequent and continuing contact with the child. [Alma]'s non-compliance with the mediation agreement filed on 11/10/2022, and subsequent filing of this petition on

7

11/18/2022, was noted in addition to the last dependency report that noted the return of the child's siblings to the natural mother as a '. . . low-risk at this time.' Of concern to the undersigned is [Alma]'s open disdain and disbelief that the natural mother is sober or capable of any change. [Alma] appeared fixated on the natural mother's history of poor choices, and potentially dangerous behaviors, understandable; however it also appears she has used them to delay or withhold visitation.

"In view of the foregoing, this investigator has concluded it is premature and not in the best interest of the minor . . . to be freed from the parental custody and control of the natural mother . . . ; however the Court may wish to take additional testimony from all parties prior to making its final decision in addition to appointing minor's counsel."

The hearing on Alma's petition proceeded in April 2024. The evaluation report was admitted into evidence. With regard to the testimony at this hearing, we touch only upon relevant matters that were not previously mentioned.

Alma testified extensively as to A.S.'s contacts with the child. As relevant here, she stated that she had encouraged A.S. to have more contact. As to Jaime, she testified that she had visited three times in 2017, six times in 2018, and twice in 2019, with no visits thereafter.

As to J.S., Alma testified that she provided for her medical needs and that the child had started school in August 2023. Somewhat in conflict with what she had told the evaluator, she testified that J.S. had no "unusual" health issues after she was four months old.

Alma acknowledged participating in some visits between J.S. and Jaime's other children. The last visit was in approximately 2021. Alma

8

stopped the visits after the dependency case involving the other children ended.

Alma had changed her cell phone number more than once since J.S. had been in her custody. She closed her social media account in 2019.

With respect to mediation, Alma acknowledged that she had attended, but denied that an agreement for visitation had been reached. She acknowledged that she signed something, but claimed she was "threatened" into signing it, but she later stated she signed the agreement "voluntarily," before asserting she was "pressured into it." She verified her signature was on the agreement. Alma testified that she did not allow Jaime to start visits after the mediation because she had not seen drug test results. Alma said she communicated with Jaime for about a week after the mediation, and stopped once she retained counsel.

Alma testified that as of the date of the hearing, she had no intention of allowing Jaime to ever see J.S., and no intention of allowing sibling contact until J.S. turned 18.

Jaime also testified. Her testimony was largely consistent with her statements to the evaluator. When J.S. was born, she was addicted to heroin and methamphetamine. She entered into the guardianship believing Alma would return J.S. to her once she was able to care for the child. She also believed the guardianship was necessary to prevent J.S. from entering into foster care. She visited J.S. occasionally in 2018 and 2019 while still suffering from her addiction.

Jaime had been sober since May 2020. She went from a rehab facility to a sober living location. By then, she was working. Both her other children had been in foster care, and she successfully reunited with them. At

9

the time of the hearing, she lived with both daughters and supported them by working at a grocery store.

In late 2021, Jamie sought contact with J.S. She waited until then based on the advice of a social worker who told her it would be better to wait until she regained custody of her other daughters and the child protective services case was closed. Alma did not respond, and Jaime subsequently sought to terminate the guardianship. Mediation took place thereafter, and as mentioned previously, Alma refused to abide by the terms she agreed to.

Jaime was opposed to Alma's adoption petition because she believed she deserved to be a part of her daughter's life. She had a full-time job, was able to support herself, and had custody of J.S.'s siblings. She lived in a two-bedroom apartment and had the space and a bed for J.S.

After hearing from Alma, Jaime, and other witnesses, the court reached its decision. The court ruled: "The court finds that pursuant to . . . Section 1516.5 that the parents, in fact, do not have custody of the minor child and have not had custody for a period of over two years; however, the court finds that there is insufficient evidence that the minor child would benefit from being adopted by the guardian at this time. Additionally, the court notes under [Family Code section] 7822 that, yes, there was a period of time where [Jaime] did not communicate with the minor child; however, the court makes a specific finding at this time that that period of time, that presumption of evidence that was presented based on the period of time was overcome.

"The court finds that [Jaime] has overcome that presumption, and that she did not intend to abandon the child during that time frame. She

10

was unable to have contact with the child during that time frame." The court expressly found that Alma had "block[ed]" Jaime's efforts to contact J.S.

"The court finds at this time under [sections] 7800 and 7801 of the Family Code that the child's best interests would not be served or protected by granting this petition.

"The court finds that the best interest of the child is served by denying the petition at this time.

"And with that, the court finds that [Alma] has not met her burden by clear and convincing evidence, not under [section] 1516, not under [Family Code section] 7822 (a)(2) and not under [Family Code section] 7822 (a)(3)."

## DISCUSSION

## I.

### RELEVANT STATUTORY FRAMEWORK AND STANDARD OF REVIEW

Section 1516.5 governs Alma's petition. Subdivision (a) states a proceeding to free a child from parental custody and control may be granted if all of the following requirements are satisfied:

"(1) One or both parents do not have the legal custody of the child.

"(2) The child has been in the physical custody of the guardian for a period of not less than two years.

"(3) The court finds that the child would benefit from being adopted by his or her guardian. In making this determination, the court shall consider all factors relating to the best interest of the child, including, but not limited to, the nature and extent of the relationship between all of the following:

"(A) The child and the birth parent.

"(B) The child and the guardian, including family members of the guardian.

"(C) The child and any siblings or half siblings."

Further, the court is required to "appoint a court investigator or other qualified professional to investigate all factors enumerated in subdivision (a)" and produce a written report. (§ 1516.5, subd. (b).)

Case law has shed further light on these requirements. "Although the finding required by section 1516.5, subdivision (a)(3) is simply that 'the child would benefit from being adopted by his or her guardian,' there is no doubt that this requires a determination of the child's best interest. It would be absurd for the court to conclude that *any* benefit from adoption would be sufficient, regardless of competing considerations. 'Benefit' in this context means that adoption would be the best alternative for the child, as is clear from the Legislature's specification that '[i]n making this determination, the court shall consider all factors relating to the best interest of the child . . . .'" (*Guardianship of Ann S.* (2009) 45 Cal.4th 1110, 1128, fn.10 (*Ann S.*).) All factors relating to the child's best interest "would include the circumstances leading to guardianship, the parent's efforts to maintain contact with the child, any exigencies that might hamper those efforts, and other evidence of commitment to parental responsibilities." (*Id.* at p. 1132.)

In the probate court, the burden is on the petitioner to demonstrate that the facts support granting the petition under the clear and convincing evidence standard. (*Ann S., supra,* 45 Cal.4th at p. 1127, fn. 9.) On appeal, we examine the record for substantial evidence to support the court's order. "When determining whether substantial evidence is present, we do not resolve conflicts in the evidence, pass on the credibility of witnesses, or determine where the preponderance of the evidence lies. [Citation.] We

12

merely determine if there is any substantial evidence, *contradicted or not,* which will support the conclusion of the trier of fact. [Citation.] Substantial evidence is 'reasonable, credible evidence of solid value such that a reasonable trier of fact could make the findings challenged. . . .' [Citation.] The appellant must show the evidence is insufficient to support the trial court's findings." (*Adoption of Myah M.* (2011) 201 Cal.App.4th 1518, 1539.)

Alma only contests the probate court's findings under section 1516.5, and does not argue any findings under Family Code section 7822. We therefore limit our discussion to the Probate Code.

## II.

### THE PROBATE COURT EXAMINED THE PROPER FACTORS

Alma's first contention is that the probate court improperly considered Jaime's fitness as a mother. She does not cite any authority for her argument that this is an inappropriate consideration. "'[T]he court shall consider all factors relating to the best interest of the child . . . .'" (*Ann S., supra,* 45 Cal.4th at p. 1128, fn.10.) The record reflects that the court briefly considered Jaime's fitness in the context of her successful drug recovery. Indeed, the court expressly stated the "case does not revolve around that" and the focus was on Alma rather than Jaime. We find the court's brief reference to Jaime's recovery does not constitute an inappropriate inquiry in the context of the statutory scheme.

Next, Alma takes issue with the court discussing the lack of an adoption report, complaining that the court appeared to consider whether she was suitable as a prospective adoptive parent. Again, this is something the court referenced only briefly, noting that an adoption petition had not been filed until January 2024 when the termination matter had been pending for over a year. The court noted the lack of a report left the court without the

13

opportunity to consider whether an adoption would be appropriate, but expressly stated this was "not evidence in itself" but merely a "lack of information." Whether the termination of Jaime's parental rights would eventually lead to adoption was an appropriate consideration within the larger inquiry into J.S.'s best interest. Accordingly, we find no error.

Overall, we find the court considered the proper factors in reaching its decision to deny the petition. The court's review of the factors set forth in section 1516.5, subd. (a)(3) was extensive and thorough.

III.

SUBSTANTIAL EVIDENCE TO SUPPORT THE COURT'S ORDER

Alma attempts to turn the standard of review on its head, seemingly arguing there was substantial evidence to support her desired outcome. But that is not how substantial evidence review works in the appellate court—the only question before us is whether there was substantial evidence to support the court's decision, not whether substantial evidence would have supported the opposite conclusion. (*Pope v. Babick* (2014) 229 Cal.App.4th 1238, 1245.)

Alma complains the court focused on *her* stability, rather than the child's stability in her care. But the stability of a caregiver is certainly a legitimate inquiry in the overall consideration of a child's best interest. She does not contend the court did not have substantial evidence to support its ruling on this point.

Among other things, the court noted Alma had "given some very inaccurate information, and it may some [*sic*] small details, but those small details have been very cumulative." She had given the facts "a slant all the way through" the case. Thus, in addition to other facts, the court found her to be an inaccurate reporter. She had also "block[ed]" communication between

14

J.S. and Jaime and prevented J.S. from seeing her siblings. While she had the attitude of wanting to do the right thing, the court was "not sure that she's been able to do the right thing in many circumstances." The court found some of her testimony "evasive," as well as "inconsistent." "It was continually inaccurate and in embellishing [*sic*] fashion to justify certain actions, and, again, it provided the court some very contradictory information going forward."

The court specifically found that it was "very difficult to say that this particular situation in and of itself is, in fact, stable." Contrary to Alma's argument, the court examined both J.S.'s stability in the home and the general stability of the situation. These were proper concerns in the larger context of J.S.'s best interest.

Alma also contends it could not be in the child's best interest "to upset [the] stability and continuity of care and introduce [Jaime], a complete stranger" into her life. She apparently ignores that Jaime's lack of presence in the child's life was due to the deliberate decision Alma made to exclude her, despite an agreement to the contrary in 2022. The court found "an extensive pattern of blocking" Jaime's efforts "at every single opportunity." Allowing Alma to use her own intransigence to justify her desired outcome would violate both the letter and the spirit of the statute, and would ignore the child's best interest.

Alma's opening brief offers no further arguments to support a claim that the probate court's order was not supported by substantial evidence. We conclude that it was. The court found that J.S.'s situation was not stable. "I have concerns about the family in and out [*sic*] various stages of sobriety, who's looking after the child, who's going to look after the child. There's no real plan in place as far as what if something happened to [Alma].

15

This court's fear is that if this petition was granted, I could be making this child an orphan . . . ." Accordingly, the court found that Alma had not met her burden to establish by clear and convincing evidence that J.S.'s best interest would be furthered by granting the petition. We agree this decision was supported by substantial evidence.

## DISPOSITION

The order is affirmed. Jaime is entitled to her costs on appeal.


MOORE, ACTING P. J.

WE CONCUR:


DELANEY, J.


GOODING, J.